COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Plaintiff,

v.

Mark A. HUMPHREY, Fredd J. Haas, d/b/a Humphrey and Haas, Defendants.

No. 69088.

Supreme Court of Iowa.

Nov. 13, 1985.

Nick Critelli and Frank A. Comito, Des Moines, for plaintiff.

David H. Remes of Covington & Burling, Washington, D.C., and Mark W. Bennett of Babich, Bennett & Nickerson, Des Moines, for defendants.

HARRIS, Justice.

After we filed our decision in this matter, *Committee on Professional Ethics v.*

*Humphrey,* 355 N.W.2d 565 (Iowa 1984), defendants took an appeal to the United States Supreme Court. Certiorari on the appeal was pending until after that Court filed its opinion in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. ——, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). Thereafter, the United States Supreme Court vacated our judgment in this case and remanded the matter to us for further consideration in light of *Zauderer.*

In compliance with this mandate we invited the parties to submit briefs discussing "the effect, if any, of the *Zauderer* decision on this case." The matter was submitted to this court, sitting en banc, upon further oral arguments. The factual background, the issues presented, and the authorities prior to *Zauderer* were set out in our prior opinion and need not be again detailed here. Our present task is only to search for any impact by *Zauderer* which might lead to a different result. We find nothing in the *Zauderer* holding at variance with our prior decision. After further consideration, we again order that a writ issue restraining defendants from continuing to place the television advertisements.

Zauderer was an Ohio lawyer who first violated his state's professional rules by placing an advertisement in a local paper. It stated he represented drunk drivers and that his "[f]ull fee would be refunded if the person charged were convicted." Zauderer ran another ad in 36 Ohio newspapers which pictured a line drawing of a Dalkon Shield intrauterine device accompanied by the question, "DID YOU USE THIS IUD?" The advertisement then detailed various afflictions the device was alleged to have caused and stated Zauderer's firm was bringing suit for women with those complaints and invited others to join. The ad then stated: "The cases are handled on a contingent fee basis of the amount received. If there is no recovery, no legal fees are owed by our clients."

Zauderer was reprimanded for the advertisements by the Ohio Supreme Court. *See* 10 Ohio St.3d 44, 461 N.E.2d 883 (1984). On appeal to the United States Supreme Court that Court held: "insofar as the reprimand was based on [Zauderer's] use of an illustration in his [second] advertisement ... and his offer of legal advice in his advertisement . . . the judgment is reversed." 471 U.S. at ——, 105 S.Ct. at 2284, 85 L.Ed.2d at 675.

I. Defendants think the *Zauderer* decision presages an end to our authority to regulate electronic advertising by Iowa lawyers. They point to the Court's discussion in addressing Ohio's prohibition of (1) overreaching and (2) blanket prohibitions.[1]

*A. Overreaching.*

The Court first considered whether Zauderer's advertisements amounted to impermissible self-recommendation and whether he wrongfully accepted employment resulting from unsolicited legal advice. The Court found the Dalkon Shield advertisement was "neither false nor deceptive: in fact, it was entirely accurate." 471 U.S. at ——, 105 S.Ct. at 2276, 85 L.Ed.2d at 665. The Court also observed the advertisement made no suggestion that Zauderer had special expertise in Dalkon Shield litigation. As a result Ohio had the burden of showing that prohibiting the ads advanced a substantial governmental interest. The Court rejected the state's argument that its interest in preventing overreaching, invasion of privacy, and undue influence justified the discipline imposed on Zauderer. *See Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 462, 98 S.Ct. 1912, 1921, 56 L.Ed.2d 444, 457 (1978) (because above in-

---

**1.** The Court also considered whether Ohio could require attorneys who advertise their availability on a contingent fee basis to include a statement indicating that a client would be liable for litigation costs even if the lawsuit were unsuccessful. Disclosure of the risk of paying litigation costs is a matter we discussed in our prior opinion. 355 N.W.2d at 570. The Court upheld Ohio's requirement, holding that a rule which required an attorney to include "purely factual and uncontroversial information about the terms under which his services will be available" passed constitutional muster. *Id.,* 471 U.S. at ——, 105 S.Ct. at 2282, 85 L.Ed.2d at 672.

terests were substantial, Court upheld ban on in-person solicitation).

The Court emphasized that the prohibition of face-to-face solicitation upheld in *Ohralik* did not extend to "truthful advertising about the availability and terms of routine legal services." 471 U.S. at ——, 105 S.Ct. at 2277, 85 L.Ed.2d at 666 (quoting *Ohralik*, 436 U.S. at 455, 98 S.Ct. at 1918, 56 L.Ed. at 453). The Court noted:

> The concerns that moved the Court in *Ohralik* are not present here. Although some sensitive souls may have found appellant's advertisement in poor taste, it can hardly be said to have invaded the privacy of those who read it. More significantly, appellant's advertisement—and print advertisement generally—poses much less risk of overreaching or undue influence.

471 U.S. at ——, 105 S.Ct. at 2277, 85 L.Ed.2d at 666.

### B. *Blanket prohibitions.*

The Court also struck down Ohio's blanket prohibition of the use of illustrations in lawyer advertising:

> [T]he use of illustrations or pictures in advertisements serves important communicative functions: it attracts the attention of the audience to the advertiser's message, and it may also serve to impart information directly. Accordingly, commercial illustrations are entitled to the First Amendment protections afforded verbal commercial speech: restrictions on the use of visual media in advertising must survive strict scrutiny under the *Central Hudson* test.

*Id.* at ——, 105 S.Ct. at 2280, 85 L.Ed.2d at 670. The Court further noted that Zauderer's illustration depicting a Dalkon Shield was not false or misleading and therefore Ohio again bore the burden of showing a substantial governmental interest to justify the prohibition. The Court rejected Ohio's argument that a blanket restriction on illustrations was necessary to ensure the public would not be misled or confused by lawyer advertising. The Court pointed to the state's lack of a record showing that the rule was necessary to avoid these risks. The Court said:

> ... because it is probably rare that decisions regarding consumption of legal services are based on a consumer's assumption about qualities of the product that can be represented visually, illustrations in lawyer's advertisements will probably be less likely to lend themselves to material representations than illustrations in other forms of advertising.

*Id.* at ——, 105 S.Ct. at 2281, 85 L.Ed.2d at 671. Thus, the Court was "not persuaded" that the state's blanket prohibition was constitutional and instead suggested that the use of illustrations in lawyer advertising would need to be policed on a case-by-case basis. *Id.*

■ We cannot believe these points, or anything said by the Court in *Zauderer*, portend what defendants insist.

II. Perhaps the strongest basis for concluding the *Zauderer* rationale has no impact on electronic media advertisements is that we have the Supreme Court's word for it. In our prior opinion in this case, 355 N.W.2d at 569, we mentioned our reliance on language in *Bates v. State Bar of Arizona*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810, 836 (1977), which acknowledged the "special problems" inherent in electronic broadcasts which warrant "special consideration." We took this exclusion seriously and at face value because we emphatically agree that "special problems" do exist in the field of electronic advertising. It was because of them that we, and those who helped us, went to considerable effort to consider and draft our electronic advertising rule. If we misapprehended the language just quoted, if there are in fact no special problems in this area which warrant a special rule, then we have squandered those efforts.

We however believe our understanding was borne out in the *Zauderer* opinion. The majority opinion in *Zauderer* strictly adheres to the exclusion of electronic advertising by carefully omitting it from its sweep. Concluding the discussion of

whether Zauderer unlawfully solicited legal business is this summary of the holding:

> An attorney may not be disciplined for soliciting legal business through *printed* advertising containing truthful and non-deceptive information and advice regarding the legal rights of potential clients.

*Id.,* 471 U.S. at ——, 105 S.Ct. at 2280, 85 L.Ed. at 670 (emphasis added). Moreover, in discussing whether Zauderer's advertisement·constituted unlawful solicitation and self-recommendation, the majority noted that "appellant's advertisement—and *print* advertisement generally—poses much less risk of overreaching or undue influence." *Id.* at ——, 105 S.Ct. at 2277, 85 L.Ed.2d at 666. (Emphasis added).

The dissenting opinion concurred in the majority's judgment concerning the use of illustrations, noting that "[a]t least in the context of *print media* the task of monitoring illustrations in attorney advertisements is not so unmanageable as to justify Ohio's blanket ban." *Id.* at ——, 105 S.Ct. at 2294, 85 L.Ed.2d at 686–87. (Emphasis added).

In a footnote to the foregoing statement is this unchallenged observation:

> Like the majority, I express no view as to whether this is also the case for broadcast media. As the court observed in *Bates v. State Bar of Arizona,* . . . "the special problems of advertising on the electronic broadcast media will warrant special consideration."

We continue to believe the "special problems" recognized by the United States Supreme Court exist in the field of electronic advertising. These problems warrant a special rule to regulate lawyer advertising in the electronic media.

III. Defendants cite the *Zauderer* holding that "self recommendation" could not be prohibited so long as the advertisement was not false or misleading or unless the state could show a substantial governmental interest in disallowing it. They also point to *Zauderer's* disapproval of Ohio's "blanket ban" on the use of illustrations in printed lawyer advertising, a disapproval which also hinged on the absence of a record showing the illustrations were false or misleading and on the absence of a substantial governmental interest. Defendants think these holdings both undermine our electronic advertising rule.

We have alternative, though closely related, responses. First we claim, as we did in our prior opinion, a substantial governmental interest in regulating what we perceive as a very real potential for abuse. We identify such a potential in the field of the electronic media for the same reasons that impelled the United States Supreme Court to target it as an area with special problems. Those special problems were spelled out to our satisfaction in the exhaustive record made in the public hearings before our ethics committee. We mentioned those hearings and their place in the development of their rule in our prior opinion. 355 N.W.2d at 568. On the basis of this record we think the situation in electronic advertising lies closer to face-to-face solicitation (which, as we have said, can be proscribed) than to printed advertising (which cannot).

Electronic media advertising, when contrasted with printed advertising, tolerates much less deliberation by those at whom it is aimed. Both sight and sound are immediate and can be elusive because, for the listener or viewer at least, in a flash they are gone without a trace.[2] Lost is the opportunity accorded to the reader of printed advertisements to pause, to restudy, and to thoughtfully consider. The purpose of defendants' television advertisements was much more immediate. A former member of the firm, once a defendant in this proceeding, testified: ". . . when [the advertisement] . . . was flashed on the screen with the phone number, and the phone number repeated twice, that was designed, I believe, to promote those individuals to

---

2. For the same reason electronic advertisements are more difficult to police. A printed advertisement is much easier to document, to trace, and to preserve than an electronic advertisement.

write it down or even better grab the phone and make a call."

Our prior opinion, 355 N.W.2d at 569, relied on an observation of the United States Supreme Court that the broadcast media are uniquely pervasive and intrusive. *Federal Communications Commission v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073, 1093 (1978) ("the broadcast media have established a uniquely pervasive presence in the lives of all Americans"); *Columbia Broadcasting System, Inc. v. Demoncratic National Committee,* 412 U.S. 94, 127, 93 S.Ct. 2080, 2098, 36 L.Ed.2d 772, 798 (1973) ("viewers constitute a 'captive audience' "). This pervasiveness bears on the contrast between print and electronic advertising. One expert witness explained: " . . . You are watching a television program. The ad is there. It intrudes upon your area of visibility, and forces itself upon you, but a print ad is not the same way."

■ Our belief that electronic advertising presents a very strong potential for abuse, justifying its regulation, was also borne out by plans for future advertising for these defendants. Norton Frickey, of Denver, Colorado, testified as president of the enterprise which prepared and sold the television advertisements at issue. He testified that lawyers need to use advertisements to improve their image and was asked, on cross-examination, about plans to use John Madden, formerly a professional football coach and now a sports announcer. Norton described Madden as "an image enhancer." His testimony continues:

If you put your name on a T.V. commercial where John Madden is a spokesman, you've just got to believe me that it will enhance your image.

Q. And people will come to [the lawyer placing the ad] because of that? A. Well, certainly, people will call.

. . . . .

Q. He is kind of known as a fighter isn't he? Those [beer] commercials that he [Madden] does where he busts up a bar and goes after them? A. Well, I would like to project that image as a lawyer, and if he does project that image, I'll expect it. I would be proud if that's the way he comes out to the public. I would accept that.

We think the purpose—and the obvious effect—of this advertising is far removed from what was targeted as protected in *Zauderer* and in *Bates.* It should scarcely be necessary to mention that the prohibitions against lawyer advertising, which we formerly maintained in common with the other states, were struck down because of a perceived need for the public to gain information. That information concerned the availability and cost of legal sevices. Electronically conveyed image-building was not a part of the information package which has been described as needed by the public. The special potential for abuse presented by electronic lawyer advertising is especially apparent at the important line we have tried our best to draw between the dissemination of protected information and crass personal promotion. The field cries out for careful regulation.

■ IV. We of course deny that our rule amounts to a blanket ban, in the sense proscribed in *Zauderer.* Rather, the rule provides only for the regulation of a form of advertising which is recognized as ripe for abuse. We have no apologies to make for our rule. We believe it to be decidedly in the interest of the public in the state we serve. We ratify our prior order that a writ issue.

WRIT ISSUED.

All Justices concur except REYNOLDSON, C.J., and SCHULTZ and WOLLE, JJ., who concur specially, and UHLENHOPP, LARSON, and McCORMICK, JJ., who dissent.

REYNOLDSON, Chief Justice (concurring specially).

I join the majority opinion, and write further only to express my deep philosophical concern for the future of state

courts if the *Zauderer*[1] holding is to be extended to the uncontrollable and inevitable machinations of television advertising, absent the safeguards provided by our rules challenged here.

I. Surely no one will dispute there is a compelling state interest that state courts be, *and should be perceived to be,* forums in which controversies will be seriously and dispassionately resolved, and justice administered, in a structured, disciplined, and dignified environment. It is more than an axiom that "[j]ustice must satisfy the appearance of justice."[2]

From the early history of the common law to this day, lawyers have been inextricably linked in the minds of persons generally, as well as in fact, to the functions of the courts and the adjudication process. Blackstone in the middle of the 18th century wrote that attorneys were "admitted to the execution of their office by the superior courts of Westminster hall, and are in all points officers of the respective courts of which they are admitted."[3] The observation from *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572, 588 (1975), that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts,'" has been underscored by repeated quotation in subsequent Supreme Court decisions.[4] Small wonder, then, that "[s]ince the founding of the Republic, the licensing and regulation

of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions,"[5] and that the legal profession is the only profession so intimately related to the judicial branch as to be separately regulated by it.[6]

The nexus that lay persons observe between lawyers and the courts was noted by the Iowa court in *Committee on Professional Ethics & Conduct v. Bromwell,* 221 N.W.2d 777 (Iowa 1974):

Lay persons recognize that the bench and bar each have a grave and heavy responsibility in the administration of justice. The practicing lawyer assumes an important role both in and out of court. He or she is the first to pass on the merit, or lack of merit, of potential litigation as a client unfolds facts across a desk. ...

In the courtroom a lawyer is still more conspicuous as a vital force in our justice system. The importance of his function was well described more than 20 years ago by Dean Roscoe Pound:

"The average controversy is likely to have two sides, each believed in, in good faith by honest men. In order to decide such controversies satisfactorily the case of each party must be presented thoroughly and skillfully, so that things are put in their proper setting and the tribunal may review the whole case intelligently and come to a conclusion with assurance that nothing has

**1.** *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. ——, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).

**2.** Friendly, *On Judging the Judges,* in State Courts: A Blueprint for the Future 72 (T. Fetter ed. 1978) (quoting Justice Felix Frankfurter).

**3.** 2 *Sharswood's Blackstone's Commentaries* 25 (1864).

**4.** *See, e.g., Hoover v. Ronwin,* 466 U.S. 558, —— n.18, 104 S.Ct. 1989, 1996 n.18, 80 L.Ed.2d 590, 600 n.18 (1984); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 484 n.16, 103 S.Ct. 1303, 1316 n.16, 75 L.Ed.2d 206, 223–24 n. 16 (1983); *In re Primus,* 436 U.S. 412, 422, 98 S.Ct. 1893, 1899, 56 L.Ed.2d 417, 428 (1978).

**5.** *Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717, 722 (1979).

**6.** This inherent regulatory authority is claimed under the judicial power constitutionally allocated to the courts. *See, e.g., Conway-Bogue Realty Investment Co. v. Denver Bar Association,* 135 Colo. 398, 409, 312 P.2d 998, 1002 (1957); *People ex rel. Illinois State Bar Association v. People's Stock Yards State Bank,* 344 Ill. 462, 470, 176 N.E. 901, 905 (1931); *Committee on Professional Ethics & Conduct v. Bromwell,* 221 N.W.2d 777, 780 (Iowa 1974); *In re Integration of Nebraska State Bar Association,* 133 Neb. 283, 287, 275 N.W. 265, 267 (1937); *Danforth v. Egan,* 236 S.D. 43, 47, 119 N.W. 1021, 1022–23 (1909).

been overlooked, nothing misapprehended, and nothing wrongly valued.

. . . .

... [P]roper presentation of a case by a skilled advocate saves the time of courts and so public time and expense. It helps the court by sifting out the relevant facts in advance, putting them in logical order, working out their possible legal consequences, and narrowing the questions which the court must decide to the really crucial points. ... Experience has shown abundantly the waste involved in inexpert presentation of cases by laymen or by inexperienced or inept practitioners."—The Lawyer from Antiquity to Modern Times, pp. 25–26 (West Publishing Company, 1953).

It is in these ways that lawyers are inextricably and logically connected, in the public view, with the application of law and the protection of constitutional rights.

*Id.* at 779.

The state courts cannot be disassociated, in the minds of lay persons, from the conduct of their officers, either in or out of court. These courts, struggling in the face of financial constraints to fulfill their most basic functions, have not been supplied with sufficient resources to expand their regulatory responsibility in order to police even the ingenious activity of the minority of lawyers who have utilized print advertising to promote dishonest scams. Such a

lawyer defrauded many Iowa clients without the knowledge of the court before his license could be revoked.[7] One need not conduct a formal poll of the nation's chief justices to determine that a number of states, faced with the massive task of regulating lawyer print advertising under the after-the-fact, case-by-case scrutiny applied in the commercial setting, are abandoning the field with mild rule admonitions to do nothing undignified or misleading, words subject to constitutional challenge.[8] The task would loom even larger if the sights, color, sounds, subliminal messages, and not-so-hidden persuaders of commercial television advertising were added to the burden.

Many of the more flagrant advertisements by court officers, generated by greed, do more than diminish state courts in the eyes of the public. The total legal advertising movement, coupled with the climate created by words taken out of context in implementing Supreme Court decisions (for example, the *Bates* statement that "the belief that lawyers are somehow 'above' trade has become an anachronism"),[9] has resulted in increased unsavory solicitation. The horde of lawyers that descended on the disaster at Bhopal, India, brought the American judicial system into worldwide disrepute.

II. The record before us demonstrates some of the problems inherent in policing television advertising without the safe-

---

7. *See Bishop v. Committee on Professional Ethics & Conduct,* 521 F.Supp. 1219 (S.D.Iowa 1981) (attack by Bishop on Iowa's advertising rules that were drafted with the intent to conform with the holding in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977)), *vacated and remanded,* 686 F.2d 1278 (8th Cir.1982) (on ground lawyer's license had been revoked, rendering case moot; attorney not adequate representative at time class was certified); *In re Bishop,* 320 N.W.2d 47 (Iowa 1982) (license revoked for converting funds). This lawyer, who advertised extensively and testified that 80% of his clients came to his office as a result of his advertisements, 521 F.Supp. at 1221, collected fees and costs in his legal clinics located in three Iowa cities, then left the state. Thus far 82 claims totaling $17,564.50 have been pro-

cessed and paid by the Client Security and Attorney Disciplinary Commission, out of funds provided by Iowa lawyers and judges. *See* 1984 Client Sec. & Att'y Disciplinary Comm'n Ann. Rep. 3; 1983 Client Sec. & Att'y Disciplinary Comm'n Ann. Rep. 3; 1982 Client Sec. & Att'y Disciplinary Comm'n Ann. Rep. 4.

8. *But see Spencer v. Honorable Justices of the Supreme Court,* 579 F.Supp. 880, 892 (E.D.Pa. 1984), *aff'd,* 760 F.2d 261 (3d Cir.1985); *Bishop,* 521 F.Supp. at 1232 ("dignified," as used in advertising, held not unconstitutionally vague).

9. *Bates v. State Bar of Arizona,* 433 U.S. 350, 371–72, 97 S.Ct. 2691, 2703, 53 L.Ed.2d 810, 828 (1977).

guards of our rules, and the damage to the justice system occasioned by those officers who utilize the manipulative television techniques of the marketplace.

Norton Frickey, president of Network Affiliates, the lawyer and advertising salesman who produced defendants' television advertisements, volunteered that he failed miserably when he attempted to do his own soliciting via television. The secret, he discovered, was to use "authoritarian figures" like the fake doctor in the advertisement run by the defendants, or, continuing down the series, the fixture-breaking ex-coach John Madden, famous for his Miller beer advertisements. The intent of Frickey's advertisements is to have the advertised lawyers be seen by the public as "skillful and competent," "trustworthy and honest," and the product is specifically "designed ... to have people call you." A casual scrutiny of the "doctor" television advertisement run by these defendants discloses the bottom-line message: A *thinking* injured person [10] would telephone the *defendants*.[11] Under this record, however, the defendants had no demonstrated expertise in personal injury litigation.

The disturbing future progress of lawyer television advertising surfaced throughout this litigation. Defendants' alleged advertising expert, Lori B. Andrews, defended with slight amusement a Wisconsin court officer's advertisement, which she described in the following language:

In the particular ad at issue, he does his ads in a humorous way and they're all take-offs of existing ads by major advertisers. The particular ad you're talking about was a take-off on a jewelry ad, and in the ad he comes out of water in a scuba suit and tells people that [if] they're in over their head with bankrupt-

cy problems, they can call the legal clinic. . . .

Further, in a recorded colloquy during the submission of this case, counsel for defendants expressed no reservations about the "award winning" lawyer television advertising, itself the subject of a long-running advertisement in a national lawyer's magazine. A copy of this advertisement is attached as an addendum to this concurrence.[12] Here is the robed judge, on the bench flanked by flags with his gavel before him, listening with intense and respectful concentration to a one-on-one dissertation by the lawyer, who rests his elbow casually on the bench. The message conveyed to the viewer is obvious: Here is a lawyer who has the private ear of the judge in the courtroom. The message about the court is equally, and unfortunately, very clear.

Although such advertisements may propose a "commercial transaction," *Zauderer*, 471 U.S. at ——, 105 S.Ct. at 2275, 85 L.Ed.2d at 663, most are transactions designed to be consummated in the trial courtrooms of the states, where ninety-six percent of the litigation in this country occurs. These solicitations are tailored further to establish firm linkage between the advertising lawyers and the courts. It is not surprising that the logos most repeatedly usurped by advertising lawyers are the scales of justice, which historically, in one form or another, have graced thousands of state courtrooms.

Solemn forums for the litigation of cases whose lawyer-officers resemble carnival barkers at the doors scarcely can avoid being viewed as carnivals, or at least, places where justice is bought and sold as in any marketplace. Judicial systems are not equipped, nor do they have the time, to police Madison Avenue.

---

**10.** The description of the television advertisement contained in the minority opinion omits the declaration of the fake doctor that "[t]he *choice* of a lawyer could be important. That's something to *think* about." (Emphasis added.) This, of course, is followed at once by the name of the defendant firm.

**11.** *See Bates,* 433 U.S. at 383–84, 97 S.Ct. at 2709, 53 L.Ed.2d at 835–36 ("[A]dvertising claims as to the quality of services ... are not susceptible of measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction.").

**12.** *See, e.g.,* Trial, Jan. 1984, at 7; Trial, Mar. 1984, at 9.

III. Neither can merit be perceived in the implied suggestion that the necessary regulation be accomplished through the Federal Trade Commission, which appears here as amicus on behalf of defendants.[13] The FTC's ability to insure that advertising "flows both freely and cleanly"[14] in the commercial arena may be tested with John Madden's beer advertisements which teach youths watching televised sports that drinking Miller's is macho and interests attractive women; or with the subtle messages to millions of adolescent girls that they can become both slim and daring by smoking Virginia Slims[15]; or with the televised demonstrations, watched by impressionable children, that baseball players and cowboys get real pleasure by placing another carcinogen, Skoal, between cheek and gum, utilizing the thumb and finger.

Iowa long has been in the forefront with protective measures for persons involved in its legal processes, all with the support of its organized, voluntary bar association. The Iowa Supreme Court was the second in the nation to mandate continuing legal education for lawyers and judges.[16] It was the first in the United States to mandate compulsory audits of lawyer trust accounts.[17] This step was ancillary to court rules which created a client security fund, now totaling over $1,400,000,[18] to reimburse embezzled clients.[19] As of July 1, 1985, through supreme court order,[20] Iowa became one of a handful of states[21] mandating that interest on lawyer trust accounts be combined through a commission and used primarily to provide legal services to the poor in civil cases. Further, lay persons appointed by the court serve on its Committee on Professional Ethics and Conduct, Grievance Commission, Client Security and Attorney Disciplinary Commission, Commission on Continuing Legal Education, Board of Law Examiners, Lawyer Trust Account Commission, and Specialization Committee.

The Iowa Supreme Court continued this movement after *Bates,* following the procedures outlined in its first opinion, *Committee on Professional Ethics & Conduct v. Humphrey,* 355 N.W.2d 565, 568 (Iowa 1984), to bring its rules into conformance. We were then only concerned, of course, with amending those rules so that they did not "prevent the publication in a newspaper of [lawyers'] truthful advertisement concerning the availability and terms of routine legal services." *Bates,* 433 U.S. at 384, 97 S.Ct. at 2709, 53 L.Ed.2d at 836. Following the federal district court decision in *Bishop,* 521 F.Supp. 1219, we again amended our rules in the few respects they there were found constitutionally deficient.

**13.** There is no reason to believe that the Federal Trade Commission would take a position opposing that of another United States agency, the antitrust division of the United States Department of Justice. On September 21, 1984, the antitrust division sent a letter to the highest judicial courts of forty states, including Iowa, criticizing the American Bar Association's new model rules concerning fees, solicitation, and advertising because they would *curtail* "face-to-face conversations ... that focus on the prospective client's particular legal problem." Letter from J. Paul McGrath, Assistant Attorney General, AntiTrust Division, to W.W. Reynoldson, Chief Justice of the Iowa Supreme Court, at 5 (Sept. 21, 1984); *see ABA President Answers Justice Dept. Attack,* Bar Leader, Jan.-Feb. 1985, at 11–12.

**14.** *Bates,* 433 U.S. at 384, 97 S.Ct. at 2709, 53 L.Ed.2d at 836.

**15.** Over 350,000 Americans each year, or almost 1000 every day, die of cigarette smoking. Most became addicted to nicotine as adolescents. Between 1968 and 1979, smoking among all teenaged girls increased from 8.4% to 12.7%. Among 17 to 18-year-old girls, 26.2% smoke. American Heart Association, American Lung Association, American Cancer Society, *Smoking or Health* 4, 9–12 (Mar. 1985).

**16.** Order filed April 9, 1975.

**17.** Order filed December 5, 1973.

**18.** 1984 Client Sec. & Att'y Disciplinary Comm'n Ann. Rep. 1.

**19.** Order filed December 5, 1973.

**20.** Order filed December 28, 1984, establishing the trust account as of July 1, 1985, pursuant to an application filed by The Iowa State Bar Association.

**21.** As of June 1, 1985, only four states had mandatory systems. 3 IOLTA Update 11 (Summer 1985).

After *Zauderer* was filed, we have amended our rules to permit advertising other than words and numbers, and to assure that our itemization of objective information would be viewed merely as a "safe harbor" approach.[22] We thought we had provided the means by which all objective information concerning a lawyer's education, experience, skills, fees, and availability could be conveyed to a potential client making a reasoned selection among advertising lawyers. The resulting rules do not constitute the bright line we might have drawn to protect the stature of the courts against the excesses of unprofessional court officers, but at least it was not obliterated.

*Zauderer*, which narrows any remaining gap between state court officers and tradespeople with respect to the puffing that may be permissibly printed, further endangers the capability of the courts to identify and dislodge lawyer print advertising that is false, deceptive, or misleading. The line is blurred further if *Zauderer* is to be applied without restriction to the television media and solicitation for services in state courts is to be delegated to "authoritarian" pitchmen utilizing all the slick imagery, promotion, and aggressive overreaching of Madison Avenue in the invasion of lay persons' living rooms.

The effectiveness of state courts, which have only moral suasion and public respect

for the ultimate vindication of their judicial power,[23] is enhanced by the perception that courts are served by a cadre of professional court officers.[24] These professionals in turn should be perceived in the light described by Justice Frankfurter:

> From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

*Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 761, 1 L.Ed.2d 796, 806 (1957) (concurring opinion). The television advertising exposed in the record before us hardly projects the above-described qualities. I am unwilling to believe the Supreme Court would extend *Zauderer* to the undefinable parameters of commercial television. Nor should we. Our rules are designed to permit television advertising while avoiding the excesses and dangers otherwise so inherent and accepted in that media. These rules reasonably protect defendants' first amendment rights. At the same time, they protect the integrity of Iowa's courts in "the primary governmental function of administering justice."[25]

SCHULTZ and WOLLE, JJ., join this special concurrence.

---

**22.** Order filed November 8, 1985.

**23.** *See* 1 A. de Tocqueville, *Democracy In America* 145 (P. Bradley ed. 1945):

It is a strange thing, the authority that is accorded to the intervention of a court of justice by the general opinion of mankind! It clings even to the mere formalities of justice, and gives a bodily influence to the mere shadow of the law. The moral force which courts of justice possess renders the use of physical force very rare....

**24.** *See* Address by Simon H. Rifkind to the National Conference of Bar Presidents, Detroit (Feb. 15, 1985) adapted and printed in *Professionalism Under Siege*, Bar Leader, Sept.-Oct. 1985, at 13–14.

**25.** *Bates*, 433 U.S. at 361–62, 97 S.Ct. at 2698, 53 L.Ed.2d at 822.

ADDENDUM

# Let our award-winning television build your award-winning practice.

When you turn to television marketing to build your personal injury practice, you're being watched Closely. Not only by your clients. But by your judges, too. How you look in the media could have a lot to do with how you look in the courtroom.

Alma Productions pioneered television advertising for attorneys We did it with the kind of professionalism and creative skills that won us some of the highest awards in the industry.

But the most important awards are the ones that you'll be seeking. And that's where we really perform best. With an advertising program that reaches out to prospective personal injury and wrongful death clients With commercials that enhance your image, rather than lower it Commercials that appeal to people's intelligence, rather than insult it.

We've just finished production on a new series of eight commercials. They focus on the need for legal help in a variety of personal injury situations, as well as in wrongful death. Included is an award-winning commercial designed to build confidence in the legal profession and the justice system.

We've been helping attorneys increase their personal injury income dramatically ever since we first introduced our concept of television marketing. We'd be happy to share some of the figures with you. Real figures Not outlandish claims.

Our marketing director is available to discuss our program And to show you our newest series. He can also counsel you on the entire process of planning, buying and evaluating television time-buying.

Let us show you how our success can build your success

Call collect: (303) 758-4720.

## Alma Productions

1770 High Street
Denver, CO 80218

UHLENHOPP, Justice (dissenting).

I had thought our rules constituted a reasonable compromise between unrestricted lawyer advertising and the maintenance of the dignity of the profession of law, so as to satisfy the First Amendment as construed in *Bates v. State Bar of Arizona*, 433 U.S. 350, 87 S.Ct. 2691, 53 L.Ed.2d 810 (1977). But the United States Supreme Court has now remanded the present case to us for reconsideration in light of *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. ——, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). While *Zauderer* did not involve the electronic media, the Supreme Court must have believed it has relevancy to the present case.

In reconsidering this case, our duty is to try to anticipate the Supreme Court's opinion on it or on a case like it, in light of *Zauderer*. Upon closely reading *Zauderer*, I have the impression that the Court takes quite a broad view of constitutionally protected lawyer advertising. I therefore reluctantly conclude that the rules which defendants challenge cannot stand. Hence I would dissolve the temporary injunction and would restrain enforcement of those rules.

LARSON, Justice (dissenting).

A doctor turns from an x-ray viewer and faces his television audience. His nurse is at his side. The doctor says he has "see[n] firsthand, injuries caused by the neglect of others," and, if the viewer has suffered such an injury, he "should be talking to a lawyer."

The scene immediately switches to an office, presumably that of a lawyer. A background voice says:

If you're injured through the negligence of others, call the law firm of Humphrey, Haas and Gritzner. Cases involving auto accidents, work comp [sic], serious personal injuries and wrongful death handled on a percentage basis. No charge for the initial consultation. Call now at 288–0102.

In a separate episode, a print-shop employee turns off a noisy machine in the background to tell the television viewer that "I suffered loss of wages, incurred staggering medical bills, and endured pain and suffering, all through the negligence of others." He says, however, that he had made a mistake by failing to see a lawyer. The camera then switches to the law office scene and the same information is given about the Humphrey and Haas firm.

These are two of the three television commercials involved in this case. In the third, a bowling alley scene, two team members note they are one man short, because "he was injured through the negligence of others." They agree that the teammate should talk to a lawyer and that the choice of a lawyer "will be important." The scene then shifts to the office scene and the Humphrey and Haas "pitch."

While these commercials could be characterized as dull by today's standards, or "class B in quality," according to one witness, there is still too much pizazz in them for the Iowa rules. The doctor in the x-ray scene is not a doctor at all. He is an actor. So is his nurse. Perhaps the x-ray being examined is not even a real x-ray. The commercial is a dramatization, and that violates our rules. The "printer" commercial compounds the dramatization violation by adding the noice of the printing press, a "background sound," which is also prohibited. The bowling commercial violates the rules for several reasons: It is a dramatization, there is background sound (bowling noises), and there are two voices instead of one, which is the limit under the rules. Moreover, the commercials make "laudatory statements" about Humphrey and Haas, according to the Committee.

The majority, in its original opinion, concluded that such techniques "would manipulate the viewer's mind and will" and we must protect the viewer by prohibiting such tactics altogether. *See Committee on Professional Ethics and Conduct v. Humphrey*, 355 N.W.2d 565, 571 (Iowa 1984). I believe every Supreme Court case

from *Bates* through *Zauderer* refutes that conclusion.

While the scenes are brief, about thirty seconds each, they convey important information to viewers. First, the commercials say that, if a person is injured by another, the law might provide a remedy. (Testimony in this case, based on studies for the American Bar Association's Commission on Advertising, showed that a significant percentage of people are unaware of this seemingly self-evident fact.)[1] The commercials also provide information on contacting a law firm and on the costs for certain cases, areas also shown to be unfamiliar to many people.

The potential for these "slice of life" commercials to inform the public about other general matters, such as consumers' rights; the need for a will; or the need for legal representation in various contract relationships, such as house purchases, is almost unlimited. General information about statutes of limitations and other problems arising out of a claimant's inaction might prevent the loss of an otherwise valid claim.

Despite the need for this kind of information, it may not be included in a television commercial in Iowa, because DR2–101(B) does not permit it. That rule allows twenty categories of information, largely relating to the lawyer's background and qualifications, but prohibits dissemination of general information about the rights and needs of the viewer. Amazingly, the majority approves the suppression of such information on the theory it is necessary to prevent the viewer from being "misled." To tele-

vision viewers lacking information about the system, basic knowledge of their legal rights remains classified information.

To summarize the disciplinary rules involved, rule 2–101(A) prohibits all "appeals to the emotions," even though all of the experts testifying in this case agreed that *all* advertising is an appeal to some kind of emotion. Rule 2–101(A) also prohibits advertising which appeals to the "likes or dislikes of a person," whatever that means. Additionally, this rule provides that no information may be conveyed by any form of advertising except that contained in the "laundry list" of rule 2–101(B). Rule 2–101(B) allows television dissemination of the laundry-list items but restricts the techniques by limiting advertising to "words and numbers only, articulated by a single nondramatic voice, not that of the lawyer, and with no other background sound." The cumulative effect of these rules is to constrict the flow of information in a manner unparalleled by any other jurisdiction.[2]

### I. *The Central Hudson Test.*

Any first amendment challenge to restrictions on commercial speech must involve an application of the four-part test of *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341, 351 (1980). *See Zauderer v. Office of Disciplinary Council,* 471 U.S. ——, ——, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652, 663–64 (1985); *In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64, 74 (1982).

The majority in the original opinion in the present case acknowledged that the

---

1. Evidence in the hearing in this case included the results of an American Bar Association-American Bar Foundation joint study, which revealed: Over one-third of the persons interviewed had never used a lawyer. Of these, eighty-three percent said they did not know how to contact one. Thirty percent of those persons injured through the negligence of others did not pursue a remedy. Among the reasons given for this were (1) they could not identify the legal problems because of the lack of information; (2) they felt attorneys were inaccessible; and (3) they felt intimidated by lawyers.

2. Testimony at the hearing established that at least forty-four states permit legal advertisements which use dramatization and graphics; at least forty-three permit background music, actors, and personal appearances, while only one state other than Iowa limits the number of voices involved. It further established that at least twenty-six states require that advertisements be dignified and twenty-one states allow legal advertising limited only by the requirement that they not be false, fraudulent, misleading, or deceptive. The latter is the approach in the American Bar Association's present Model Rules of Professional Conduct 7.1 and 7.2.

*Central Hudson* test should be applied even though, I contend, it did not actually apply it. *See Humphrey*, 355 N.W.2d at 568. In the present opinion, the majority does not even acknowledge the *Central Hudson* test.

Under this test, the initial question is whether the advertisements in question are misleading or concern an illegal activity, in which case the state may prohibit them altogether. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. If the advertisements are not subject to outright prohibition, the state may restrict them only if all of the following tests are met: (1) the governmental interest in the restrictions is substantial; (2) the restrictions directly advance that governmental interest; and (3) the restrictions are no more extensive than necessary to serve that interest. *Id.*

In applying the *Central Hudson* test to this case, the threshold issue is whether the commercials are actually misleading or deceptive. All of the witnesses testifying at the hearing, including those called by the committee, agreed that the advertisements are not deceptive or misleading. The majority concedes that point. Moreover, the witnesses agreed that there is nothing inherently deceptive or misleading in dramatizations, illustrations, background sound, or music. In fact, in evidence introduced by the commission, one expert testified that "if you do not use motion in a television commercial, you get no audience. People don't pay attention to it."

Despite the consistent recognition by the Supreme Court that *Central Hudson* is the controlling test, the majority announces its own rule, one which I believe is a perversion of the *Central Hudson* test:

Without suggesting that the advertisements here were deceitful, we do agree with the committee that, *in the medium defendants chose [television], the public could well be misled by them.* We think the situation is exactly what the United States supreme court had in mind when it referred to the "special problems" in electronic media advertising. We think

the challenged rule falls clearly within the area left to us by the *Bates* opinion. *Humphrey*, 355 N.W.2d at 570 (emphasis added). The holding of the majority in the original opinion, and here, is that, because *Bates, R.M.J.*, and *Zauderer* all involved print media, they are distinguishable. Because of this fact, it holds, our court is free to fashion a new test based on the *possibility* of deception.

This is the language of *Bates* which the majority relies on:

As with other varieties of speech, it follows as well that there may be reasonable restrictions on the time, place, and manner of advertising. Advertising concerning transactions that are themselves illegal obviously may be suppressed. *And the special problems of advertising on the electronic broadcast media will warrant special consideration.* Cf. *Capital Broadcasting Co. v. Mitchell*, 333 F.Supp. 582 (D.C.1971), aff'd sub nom *Capitol Broadcasting Co. v. Acting Attorney General*, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972).

*Bates*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810, 836 (1977) (emphasis added) (citations omitted).

What does the emphasized language mean? It is possible the Supreme Court had in mind potential problems in enforcement arising out of the transitory nature of electronic advertising. This, of course, could be minimized by requiring copies of a telecast or broadcast to be kept for a specified period of time. This is the rule of several states, and the rule of the American Bar's commission on advertising, Model Rule 7.2. It is perhaps more likely that the Supreme Court was simply not willing to address a matter not specifically before it.

At any rate, I do not believe this language from *Bates* was intended to be used as a license to single out the medium of television for application of substantially different rules, or to accord it any less protection under the first amendment. In my prior dissent, I discussed this *Bates* language and the effect of *Capitol Broadcasting* cited therein. I merely incorporate

that discussion here. *See Humphrey*, 355 N.W.2d at 573 (Larson, J., dissenting).

A prophylactic rule, aimed at preventing possible abuses in some cases by imposing a ban for all cases, has been rejected by the Supreme Court. *See Zauderer*, 471 U.S. at ——, 105 S.Ct. at 2278, 85 L.Ed.2d at 668. The present case presents a classic example of such a rule: These commercials are admittedly not misleading or deceptive, yet they are to be banned because, under other circumstances in other cases, similar techniques and content might mislead someone.

The majority rationalizes this result on the ground that the state has a substantial interest at stake in "fostering rational, intelligent, and voluntary decision-making in determining the need for legal services and selecting a lawyer." *Humphrey*, 355 N.W.2d at 571 ("We think the rule [restricting techniques and content] advances the state interest by aiding the citizen in making an intelligent selection of counsel."). In other words, the majority reasons, the public cannot make an informed decision unless the state sifts out the information to be disseminated to it. This approach, characterized by the Supreme Court as "paternalistic," has also been expressly rejected by it. *See Bates*, 433 U.S. at 365, 97 S.Ct. at 2699, 53 L.Ed.2d at 824.

In *Bates*, as here, it was argued that allowing too much information could be harmful to the consumer. *Bates* noted that similar arguments had been made in an earlier case, *Virginia Pharmacy Board v. Virginia Consumer Counsel*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). It said:

> [W]e observed [in Virginia Pharmacy] that "on close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance." But we noted the presence of a potent alternative to this "highly paternalistic" approach: "That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best

means to that end is to open the channels of communication rather than to close them." The choice between the dangers of suppressing information and the dangers arising from its free flow was seen as precisely the choice "that the First Amendment makes for us."

*Bates*, 433 U.S. at 365, 97 S.Ct. at 2699–2700, 53 L.Ed.2d at 824 (citations omitted).

Even if it were established that the state has a substantial interest in preventing abuses by enactment of such regulatory measures, there is a further requirement: The state must show that the regulations are no more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. How does the majority deal with this element? By simply declaring it inapplicable; these rules do not restrict dissemination of information, the majority says, they only restrict some tools:

> We reject defendants' contention that the prohibition against background sound, visual displays, multiple dramatic statements, and self-laudatory statements is more extensive than necessary to serve the state interests. *All that is prohibited are the tools which would manipulate the viewer's mind and will.*

*Humphrey*, 355 N.W.2d at 571 (emphasis added.)

The least-restrictive-alternative argument, I believe, cannot be disposed of so summarily. The Iowa rules do not merely regulate "tools" of communication; they have a virtual stranglehold on lawyer advertising. By stringent control of techniques and content, they directly affect the dissemination of information to the public. The present case, in fact, is a good example of their effect. In this case, there is no evidence by the committee that a less restrictive method would not be effective.

The goal of regulation is to prevent fraud and deception in advertising. *See Bates*, 433 U.S. at 383, 97 S.Ct. at 2709, 53 L.Ed.2d at 835. To accomplish that goal, there are other, less restrictive, alternatives to an outright ban on techniques and content. The most obvious, of course, is to

simply prohibit false and misleading advertising. This is the rule in at least twenty-six states and the rule adopted by the American Bar Association's Commission on Evaluation of Professional Standards. *See,* Model Rules of Professional Conduct Rule 7.1 and 7.2 (1983). Any abuses could be dealt with on a case-by-case basis. This is the less restrictive alternative suggested by the Supreme Court in *Zauderer. See* 471 U.S. at ——, 105 S.Ct. at 2281, 85 L.Ed.2d at 671 ("Given the possibility of policing the use of illustrations in advertising on a case-by-case basis, the prophylactic approach taken by Ohio cannot stand ....").

The record in this case, moreover, showed that less restrictive alternatives are effective to prevent abuses. Most other states have rules which *are* less restrictive, rules which permit the techniques and content barred by ours. Yet, according to the testimony of the former staff director of the American Bar Association's Commission on Advertising, no problems have arisen under those less stringent rules. I think it is clear, based on that fact alone, that the suppressive regulations of our own rules are not necessary in order to prevent abuse.

I wish the majority of our court had the same degree of confidence in the bar expressed by the Supreme Court in *Bates,* when it said:

> We suspect that, with advertising, most lawyers will behave as they always have: They will abide by their solemn oaths to uphold the integrity and honor of their profession and of the legal system. For every attorney who overreaches through advertising, there will be thousands of others who will be candid and honest and straightforward. And, of course, it will be in the latter's interest, as in other cases of misconduct at the bar, to assist in weeding out those few who abuse their trust.

*Bates,* 433 U.S. at 379, 97 S.Ct. at 2707, 53 L.Ed.2d at 833.

## II. *The Effect of Zauderer.*

The Supreme Court vacated the original majority opinion in this case and remanded it for consideration in light of *Zauderer.* As already observed, the majority responds by simply saying *Zauderer* has no application, because it involved print media. I believe *Zauderer* is applicable to this case for several reasons: First, it reaffirms the Supreme Court's view that prophylactic rules cannot be imposed to restrict lawyer advertising when less restrictive means are available. Second, *Zauderer* downplayed any distinctions between lawyers' advertising and others'. It said:

> In short, assessment of the validity of legal advice and information contained in attorneys' advertising is not necessarily a matter of great complexity; nor is assessing the accuracy or capacity to deceive of other forms of advertising the simple process the State makes it out to be. The qualitative distinction the State has attempted to draw eludes us....
>
> ... Prophylactic restraints that would be unacceptable as applied to commercial advertising generally are therefore equally unacceptable as applied to appellant's advertising.

*Zauderer,* 471 U.S. at ——, 105 S.Ct. at 2279–80, 85 L.Ed.2d at 669–70.

Last, *Zauderer* is relevant to television advertising, because it emphasizes the underlying rationale for allowing lawyer advertising in the first place. That is the need of the public for more information concerning their rights under the law.

The Supreme Court in *Bates* observed:

> As the bar acknowledges, "the middle 70% of our population is not being reached or served adequately by the legal profession." Among the reasons for this underutilization is fear of the cost, and an inability to locate a suitable lawyer .... Advertising can help to solve this acknowledged problem: Advertising is the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange.

*Bates,* 433 U.S. at 376, 97 S.Ct. at 2705, 53 L.Ed.2d at 831 (citation omitted). This concern was reaffirmed in *Zauderer:*

> Our recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.

*Zauderer,* 471 U.S. at ——, 105 S.Ct. at 2279–80, 85 L.Ed.2d at 669.

While it is true, as Justice O'Connor points out in her dissent, that *Zauderer* did not actually involve electronic media, I believe the first amendment principles it recognizes nevertheless apply here. Its holding that (1) case-by-case disciplinary proceedings, as a less restrictive alternative, must be used in preference to a blanket ban; (2) its recognition that rules governing commercial advertising generally should apply to lawyer advertising; and (3) its reaffirmance of the need for a fully informed public, are as relevant to television advertising as they are to any other medium.

I think it is especially important to foster the use of television, because of its great potential for informing the public. The American Bar Association's Task Force on Lawyer Advertising, in studying the area of lawyer advertising, noted that applying more restrictive rules to television would adversely affect marginally literate persons and those who do not read print media for other reasons. The Commission observed:

> A 1975 report by the Department of Health, Education and Welfare indicates that approximately one-fifth of the adults in this nation are functionally incompetent in basic skills, including reading skills. A 1976 Roper Survey indicates that a large majority of the American public obtain information about current affairs from radio and television, rather than newspapers.

ABA Code of Professional Responsibility Amendments, *Task Force on Lawyer Advertising, Report to the Board of Governors,* 46 U.S.L.W. 1, 2 (August 23, 1977).

The American Bar Association Commission on Evaluation of Professional Standards rejected the notion that different rules should be adopted for television. The Commission in its comment noted:

> Television is now one of the most powerful media for getting information to the public, particularly persons of low and moderate income; prohibiting television advertising, therefore, would impede the flow of information about legal services to many sectors of the public. *Limiting the information that may be advertised [by television] has a similar effect and assumes that the bar can accurately forecast the kind of information that the public would regard as relevant.*

Model Rules of Professional Conduct Rule 7.2 (1983) (Commission comment) (emphasis added).

The need for increased public understanding of the legal system, and the potential of television to fill that need, is borne out in a report made to this court in 1981 by the Iowa Judicial Coordinating Committee. The report began with this observation:

> "The judiciary is the least understood of the three branches of government, yet it does the least to assist the public and the news media in truly understanding the function of the judicial process." Since the turn of the century, the responsibility, power, and authority of the courts has expanded at a rapid pace, with the courts becoming perhaps the most powerful and persuasive governmental force in this country. Issues presented to and decided by the courts touch on all parts of the citizens' lives. *Despite the importance of these issues and the effect of court decisions on citizens, the public has a very limited understanding and comprehension of the legal system.*

*Public Opinion Survey: The Iowa Court System,* 1 (Judicial Coordinating Committee, Iowa Supreme Court, 1981) (emphasis added) (footnotes omitted).

Central to this report was a survey of Iowans concerning the extent and sources

of their knowledge of the legal system. There is an interesting statistic included in that survey. In response to the question, "From what source have you learned the most about Iowa courts?", nineteen percent said school or formal instruction. *Id.* at 23. Almost as many, eighteen percent, said it was from television. Thirty-nine percent said it was from newspapers. *Id.* The Iowa report also cited a national survey which showed that in fact more people gained information from television than from newspapers. *Id.* at 25.

I believe dissemination of useful information and the attendant elimination of some of the mystique surrounding the legal process would not only provide valuable information to the viewer, it would in fact enhance the image of the legal profession. More significantly, rules which would permit this would comply with the first amendment.

I would dissolve the temporary injunction and restrain the enforcement of these rules.[3]

McCORMICK, J., joins this dissent.

---

**3.** *Zauderer* held that advertising rules could require an attorney advertising a contingent fee to state, in the advertisement, that the client might be liable for certain costs, even if the client lost the case. Humphrey and Haas concede this holding would cause problems with their commercials, which did not contain such a statement. On this issue, *Zauderer* is distinguishable because, in that case, the advertisement said there would be "no charge" if the client lost, while the Humphrey and Haas commercials involved here made no such statement. In any event, these defendants chose not to argue that issue.