IN THE MATTER OF THE PETITION OF
FELMEISTER & ISAACS.

Argued October 22, 1984—Decided December 10, 1986.

*David B. Rubin* argued the cause for appellant, Felmeister & Isaacs (*Rubin, Rubin & Malgran,* attorneys).

*Susan L. Reisner,* Deputy Attorney General, argued the cause for respondent, State of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

*Thomas R. Curtin* argued the cause for *amicus curiae,* New Jersey State Bar Association.

The opinion of the Court was delivered by

WILENTZ, C.J.

The petition in this matter attacks the constitutionality of this Court's most recently adopted regulation of attorney advertising prohibiting "the use of drawings, animations, dramatization, music or lyrics" and requiring that "[a]ll advertisements ... be presented in a dignified manner." The regulation, adopted in 1984, and now found in our Rules of Professional Conduct (RPC) 7.2(a), provides:

> Subject to the requirements of RPC 7.1 [prohibiting false or misleading advertising], a lawyer may advertise services through public media, such as a telephone directory, legal directory, newspaper or other periodical, radio or television, or through mailed written communication. All advertisements shall be presented in a dignified manner without the use of drawings, animations, dramatization, music or lyrics.

We conclude that the public interest would be better served by a revised rule requiring that all attorney advertising be predominantly informational,[1] and limiting the present prohibition on the use of "drawings, animations, dramatization, music or lyrics" to television advertising. The requirement of presentation

---

[1] As noted *post* at 528, by "predominantly informational" we mean that, both in quality and quantity, the communication of factual information rationally related to a consumer's need for and choice of counsel predominates.

"in a dignified manner" would be eliminated, but advertisements relying in any way on the shock or amusement value of absurd portrayals wholly irrelevant to the selection of counsel would be prohibited. The unchallenged prohibition against false or misleading advertising would, of course, continue. The new rule, set forth as an appendix to this opinion, will take effect on January 1, 1987.[2]

Our action is predicated on both policy and federal constitutional[3] grounds. The record before us has persuaded us that the total prohibition against "drawings ..." etc., is unwise; furthermore, at least as applied to print advertising, it is unconstitutional. *Zauderer v. Office of Disciplinary Counsel,* 471 *U.S.* 626, 105 *S.Ct.* 2265, 85 *L.Ed.*2d 652 (1985). We remain concerned, however, with the potential adverse impact of such techniques and especially in television advertising; the recent dismissal by the United States Supreme Court of an attack on similarly broad restrictions on attorney television advertising suggests the constitutionality of these restrictions. *See Humphrey v. Committee on Professional Ethics & Conduct,* —— *U.S.* ——, 106 *S.Ct.* 1626, 90 *L.Ed.*2d 174 (1986) (mem.), *dismissing appeal for want of a substantial federal question from* 377 *N.W.*2d 643 (Iowa 1985); *Hicks v. Miranda,* 422 *U.S.* 332, 95 *S.Ct.* 2281, 45 *L.Ed.*2d 223 (1975).

We believe that attorney advertising without any restrictions whatsoever might seriously damage important public interests, but that excessive restriction might harm other public interests equally important. The goal, as we view it, is to strike the proper balance, one that results in the largest net gain for the public. The effort to do so, however, though guided by logic,

---

[2]We have not followed our usual procedure in adopting this rule, that is, we have not published it or requested comment on it prior to adoption. Our reasons are set forth *post* at n. 12.

[3]We do not deal with the effect of the New Jersey Constitution on these issues. Although petitioner's claims on occasion mention our state Constitution, its attack is clearly based on the federal Constitution.

necessarily suffers from inexperience; the modern era of attorney advertising, which commenced with *Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.*2d 810 (1977), is less than a decade old.[4] That effort is therefore undertaken with an open mind and a willingness to change as we learn more, as we learn, perhaps, of a better balance.

We believe this conclusion, namely, that today's formulation is tentative and subject to change based on future experience, is as important as the formulation itself. As noted later, we will reconsider the rule after we receive a report on its implementation.

We conclude further that the need to develop expertise, to administer the new rule with some flexibility, to formulate subsidiary rules and regulations, if they seem desirable, to keep the bar and the public informed, to evaluate the impact of our regulations and, if appropriate, to suggest change requires an agency to perform all of these functions, appointed by this Court and integrated into our disciplinary structure. We require this agency to report to us no later than January 1, 1988, concerning the implementation of today's regulation.

I.

For the current generation of lawyers, most of whom have spent the bulk of their careers practicing under a strict prohibition against attorney advertising, it is perhaps easy to forget that that prohibition enjoyed a relatively brief reign in American legal history. Although the English bar's historic disdain for self-promotion took root in this country, many nineteenth century American lawyers advertised their services. *See* H. Drinker, *Legal Ethics* 213 (1953); Attanasio, "Lawyer Advertising in England and the United States," 32 *Am.J.Comp.L.* 493,

---

[4]*See* Report of the Staff to the Federal Trade Commission, *Improving Consumer Access to Legal Services: The Case for Removing Restrictions on Truthful Advertising* 17 (1984): "Because lawyer advertising is in its infancy, there are few empirical studies of its effects."

502–03 (1984). As late as 1903 the editors of the New Jersey Law Journal, commenting on the increase in the publication of legal cards in newspapers, confessed "our inability to see wherein it is not wholly proper." Editorial Note, 26 *N.J.L.J.* 35 (Feb.1903).

A leading commentator of the time was in accord, *see* G. Warvelle, *Essays in Legal Ethics* 60–61 (1902), but as the influence of the organized bar grew, demands for greater professionalism increased and attitudes toward attorney advertising changed. In 1908, the American Bar Association adopted the Canons of Professional Responsibility. Canon 27 condemned as "unprofessional" solicitation of business by advertising.

The Canons of Professional Responsibility, including Canon 27, were incorporated into the law of this state with our adoption of the rules governing the courts of New Jersey in 1948. Our belief in the wisdom of the prohibition against attorney advertising was firm. Attorney advertising, we declared, "would not be in the public interest. The least capable lawyers would be apt to announce the most extravagant claims and then resort to the worst means to make them good." *In re Braun*, 61 *N.J.* 119, 122 (1972); *see also In re Rothman*, 12 *N.J.* 528, 542 (1953) ("If competitive advertising among lawyers were permitted, the conscientious ethical practitioner would be inescapably at the mercy of the braggart.").

In 1971 we replaced the Canons with the Code of Professional Responsibility. The advertising ban continued in DR 2–101(A), (B), until, six years later, the United States Supreme Court handed down its decision in *Bates*. Following that decision, we amended our disciplinary rules to allow advertising, in print only, of fees charged for routine services. *See* 103 *N.J.L.J.* 121 (Feb. 3, 1979).

In *In re Professional Ethics Advisory Comm. Opinion 475*, 89 *N.J.* 74 *app. dism., sub nom. Jacoby & Meyers v. Supreme Court of New Jersey*, 459 *U.S.* 962, 103 *S.Ct.* 285, 74 *L.Ed.*2d 272 (1982), the national law firm Jacoby & Meyers challenged

our rule prohibiting use of a firm name in this state unless all named members are or were admitted to the New Jersey bar. In considering this challenge, we noted the connection between that issue and our prohibition against television advertising: if Jacoby & Meyers' firm name could be used in New Jersey, the firm would obtain, indirectly but undeniably, an advantage over its New Jersey rivals arising out of its advertising in the New York televison market. *Id.* at 83. We therefore referred both the ban on television advertising (DR 2-101(D)) along with the firm name restriction to a special committee for study and recommendations. *Id.* at 79. The responsibility of that committee, the Supreme Court Committee on Attorney Advertising, was thereafter expanded to include a study of all of the rules concerning lawyer advertising, including printed advertisements and mailings.

That Committee's report (published as a supplement in the New Jersey Law Journal of May 5, 1983), in addition to recommending repeal of the ban on radio and television advertising, took the position that the only restriction on attorney advertising should be that it not be false or misleading. *Report of the Supreme Court Comm. on Attorney Advertising,* reprinted in Supplement, *N.J.L.J.,* May 5, 1983, at 3. A minority of the Committee concluded that, in addition to truthfulness, all attorney advertising should be dignified and that music, animations, dramatizations, etc., should be prohibited. *Id.* at 16–18.[5]

We agreed with the Attorney Advertising Committee's recommendation to repeal the radio and television ban. We accept-

---

[5]Before the Attorney Advertising Committee issued its final report, petitioner, with full knowledge of the existing ban on radio and television advertising, ran several ads on radio, advising the Clerk of this Court of its position that the ban was unconstitutional. Messrs. Felmeister and Isaacs were immediately ordered to cease broadcasting these advertisements (they complied with this order), and an ethics complaint was filed against them for having violated the rule. In the ethics proceedings Felmeister and Isaacs sought review in this Court of their constitutional challenge to the radio and television ban, a request we granted pursuant to our rule permitting interlocutory appeals under

ed the Committee's minority report, however, with respect to adopting a dignity requirement and banning drawings, animations, dramatizations, music or lyrics. We amended our disciplinary rules to reflect these recommendations. *See N.J.L.J.*, Jan. 26, 1984, at 15.

Shortly after our adoption of the new advertising standards, which we later incorporated into our Rules of Professional Conduct,[6] petitioner filed an action in federal district court challenging the constitutionality of the restrictions at issue in this case. *Felmeister et al. v. Office of Attorney Ethics*, Civil No. 84–568 (D.N.J. filed Feb. 9, 1984). Upon being advised that our Court would entertain a direct petition to the same effect, that court abstained from further proceedings pending our review. On March 20, 1984, petitioner filed the instant action directly with this Court,[7] and we thereafter remanded the matter to the trial court for the purpose of developing a fuller record.

The parties before the trial court on that remand were petitioner, the Attorney General (acting as proponent of RPC

---

such circumstances. *See R.* 1:20–5(c)(1). Sometime before we decided that appeal, the Attorney Advertising Committee rendered its report and pursuant thereto we modified our disciplinary rules to permit both radio and television advertising. Given the change we felt it unnecessary to dispose of Felmeister and Isaacs' constitutional argument. We concluded, however, that in any event their conduct in running the radio ads might be unethical and remanded the matter to the District Ethics Committee for further proceedings. *Matter of Felmeister*, 95 *N.J.* 431 (1984). Following our remand to the District Ethics Committee and its consideration of the matter, the Disciplinary Review Board recommended dismissal of the charges against Felmeister and Isaacs, finding that our opinion had already "in effect [ ] properly reprimanded" them. We adopted the DRB report.

[6]This Court adopted the Model Rules of Professional Conduct, with amendments and supplements, on July 12, 1984.

[7]This Court has original jurisdiction over this action by virtue of *N.J. Const. of 1947*, Art. VI, § II, para. 3. *See In re LiVolsi*, 85 *N.J.* 576, 583–84 (1981).

7.2(a)), and the New Jersey State Bar Association, which was given permission to intervene. Numerous exhibits were introduced, including many forms of advertisements in all media and of all kinds. Both the State and petitioner produced experts. The president of the State Bar Association testified, supporting the validity of the rule and its restrictions but contending that the rule should not be held applicable to advertising conducted by bar associations.

After considering the testimony presented, the trial court submitted its Report and Recommended Findings of Fact. The trial court found that the prohibition of "drawings, animations, dramatizations, music or lyrics" in attorney advertising did not pass constitutional muster under the United States Supreme Court's attorney advertising decisions. The factual finding underlying that conclusion was that such techniques, while they may be factually deceptive, are not inherently so. The trial court found what the record overwhelmingly supports, namely that the use of these techniques "are only inherently misleading in the sense ... [of] inducing action more on the basis of emotion than rational thought." The trial court explicitly determined that, despite this emotional aspect of these techniques, their prohibition would "preclude the effective use of legal services advertising and constitute more extensive regulation than necessary to serve the governmental interests in precluding false, misleading, and undignified advertising." Prohibiting these techniques would result in "tombstone" ads that would not "accomplish the intended purposes of attention-getting, recall assistance (memory storage), *and* supplying substantive legal services information to the public."

At the same time, the trial court stressed that its factual finding assumed not only that ads would be required to be truthful and not misleading, but also that the requirement that ads be presented in a dignified manner would be maintained. Clearly concerned with the irrational aspect of creative advertising, the trial court also noted that "careful monitoring and

measurement of the effect on the public of the use of the techniques is obviously necessary and desirable." [8]

The trial court also found that the requirement that attorney advertising be presented in a "dignified manner" was a reasonable "time, place and manner" restriction. Its additional discussion makes it clear that its finding was based on this Court's responsibility to assure "public confidence in the legal profession and the administration of justice." The trial court dismissed the contention that determination of "dignity" is impermissibly subjective, noting that such a restriction has never been held unconstitutional, that a number of courts have found it to be "workable," and that sixteen other jurisdictions include it in their attorney advertising rules.

## II.

There are various public interests involved in attorney advertising and its regulation. The record before us, combined with our own knowledge, leads to the conclusions set forth in this section.

The public would be well served by more information about the legal system in order to know its legal rights and to help it choose a lawyer to enforce those rights. In no small part because of the prior longstanding prohibition against attorney advertising, a substantial portion of the public is ill-informed about its rights, fearful about going to an attorney, and ignorant concerning how to choose one. Attorney advertising is perhaps the best way to meet these needs. *See generally* Note,

---

[8]We have found the analysis of the trial court, including the exhaustive citation to statutory material in other states, most helpful and are generally in accord, with one important exception. We do not believe that the finding that these presently prohibited techniques are necessary for effective advertising necessarily leads to the conclusion that they may not be limited in *any* fashion. Our difference with the trial court is not one of fact, but rather a difference in evaluating the interests involved and determining the extent of protection required.

"Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available," 81 *Yale L.J.* 1181 (1972).

We also conclude that the public would be better served if it could obtain legal services at a lower price.[9] Again, attorney advertising is one of the best ways to foster price competition. *See generally* Report of the Staff to the Federal Trade Commission, *Improving Consumer Access to Legal Services: The Case for Removing Restrictions on Truthful Advertising* (1984) (FTC Report).

These twin goals, informing the public and making legal services affordable, are important not only because they increase access to and lower the price of a professional service. A legal system that leaves its citizens ignorant of their rights and how to enforce them, or that puts the price of legal services beyond the reach of a substantial portion of its citizens, fails in securing one of society's most fundamental values: the attainment of justice. All members of society, not just the direct recipients and users of the messages, benefit from attorney advertising.

Attorney advertising restricted to a factual recitation (in print, by voice or image) of the need for legal services, the qualifications of the attorney, and the prices offered might fail to achieve these goals. The record suggests, and the trial court found, in effect, that few would listen. Because of that, attorneys might not compete: they simply would not advertise. We note that despite this observation, there are advertisements running in New Jersey papers regularly, and substantially complying with our present severe restrictions. Presumably

---

[9]We refer here to the obvious benefit generally obtained from price competition. The record before us suggests that such competition in certain areas of the law will lead to lower prices without sacrificing the quality of legal services. While we assume for the moment that that is generally the case, we do not pass on (since it is not before us) the question whether there are certain fields of practice in which price competition might adversely affect the quality of legal services and, if so, the legal consequences of such effect.

the attorneys running these ads feel that they are beneficial, that people *are* listening. What seems to us more significant is that so few are advertising. In any event, our review of advertising on the record before us demonstrates that advertisements can be devised that provide substantial information, that have the added virtue of being interesting, and that seem to pose minimal risks to the interests mentioned hereafter. The problem is preventing that virtue—the ability of the ad to attract and hold the attention of the consumer—from becoming a vice.

In contrast to the kind of purely informational ad described above, when an ad persuades the consumer to select a particular lawyer for reasons that have absolutely nothing to do with those qualities that are rationally related to the lawyer's competence, it may be interesting, but it performs a public *dis* service. Not only does it fail to perform the function of educating the consumer about the factors that reason tells us should be considered in making that choice, it affirmatively injects other factors into the process. The record is clear on this score. An ad, for instance, that consists practically entirely of a dramatization of an automobile accident, adding only the attorney's name, his willingness to take the case, and the possible right to get damages, provides the consumer with only one reason to select that lawyer—he is willing to take the case. None of the qualities that, rationally, should be considered is mentioned. The consumer goes to that lawyer because he picked a good public relations firm, and for no other reason. Such advertising does not serve the public good. In this respect, we differ with the trial court, whose conclusion—to impose no limit on these emotional factors except that they be presented in a "dignified" manner—implies that their value in making ads effective requires that they be permitted without restriction. The most important factor, the competence of the attorney, would be left to chance; the public might more and more consider the selection of lawyers with less and less rationality; and lawyers themselves might come to regard success as depending not on

their qualifications or performance as attorneys but on their ability to choose the most effective advertising agency.

Moreover, attorney advertising raises the understandable and realistic concern that the legal profession will degenerate into just another trade. Experts are not needed to tell us that competitive pressures would prompt attorney advertising, if unrestricted, to become more and more "effective," meaning less rational and more emotional. The concern is that as the public comes to view the profession as a trade, the profession will conform to its advertised image, and those characteristics of the profession important to society will be hurt. Willingness to perform public service, to do *pro bono* work, to represent the unpopular cause without charge, to assure justice to an accused, along with the more general qualities of honesty, candor and fairness: these are some of those professional characteristics important to society that might be affected. In their place we might find the morality and goals of the marketplace.

As noted above, however, advertising, to be effective, must attract and hold the consumer's attention. But the techniques that make ads effective are largely, as the word is used here, irrational. So while irrational selection of counsel is not in the best interest of the consumer, or of the legal profession, or of society, some balance must be achieved to minimize the risks of these irrational techniques while obtaining their benefit.

In determining the appropriate balance, we must also bear in mind the fundamental difficulty in assuring accuracy in advertising when the quality of legal services is discussed. Just as the performance of an automobile should be the most important factor in a car buyer's choice, so the performance of attorneys, the quality of the services they can render, should be of principal importance to a person seeking legal help. Yet the fact is that, to a significant extent, attorneys may not advertise the quality of their services. *See* RPC 7.1 (ad may not "create an unjustified expectation about results the lawyer can achieve" or "compar[e] the lawyer's service with other lawyers'

services") and Comment to RPC 7.1 (Rule "would ordinarily preclude advertisements about results obtained on behalf of the client"). While the facts permitted in attorney advertising (length of experience in handling such matters, law school attended, number of years at the bar, publications, list of clients) are certainly relevant to a determination of the attorney's competence, they may very well add up to the wrong conclusion. The experienced attorney who has handled these matters for many years may be less capable than the new attorney. The kind of information a sophisticated client wants—and gets—centers on the attorney's reputation: how he is regarded by his peers, how other attorneys whom the client already knows assess his ability, what his clients think of him, etc. Because of the inordinate difficulty of assuring the accuracy of such information, its advertisement may be prohibited. Yet it is the most important information a consumer would need. That which is permitted, on the other hand, may tell very little on which one should rely.[10]

This inability to assure that advertisements include the really significant information about attorney competence makes it that much more important to control irrational factors in attorney advertising. The problem of insuring that consumers receive helpful information about legal services is only exacerbat-

---

[10]In this connection we note ads that claim that the attorneys are "experienced" or that they are in one of the "largest and oldest firms." We leave it to the Attorney Advertising Committee to determine whether such potentially misleading language may be allowed and, if so, whether the precise meaning of the claim must be stated in the advertisement. Indeed, consumers might be better served, given the problems just mentioned in the text above, if a specific disclaimer about professional quality were required, including, perhaps, a disclaimer of certified expertise when the ad includes fields of practice. This disclaimer would not only prevent the consumer from being misled by the ad, but it might cause him to make independent inquiry about the attorneys. The problem, of course, is in knowing how to go about making that independent inquiry. For most potential consumers, reputation and performance in particular matters is the only significant information available, sometimes reliable, sometimes not. Absent certification of the specific field involved, the ordinary consumer has only that kind of information as a guide.

ed when the admittedly inconclusive nature of much of the information is compounded by emotional, non-rational appeals that have absolutely nothing to do with the attorney's qualifications.

We have therefore opted for a regulation that allows a minimum amount of non-rational content, enough to attract attention and create interest. Our regulation would require that the advertisement be "predominantly informational," *i.e.,* that in both quantity and quality, the communication of factual information rationally related to the need for and selection of an attorney predominates. A radio ad dramatizing an automobile accident, say, for fifteen seconds, followed by fifteen seconds telling the consumer that he may have a legal right to recover damages for his injuries and that Mr. Smith is willing to handle the case, would not comply. The dramatization (although related to the need for any attorney, when linked with the final message) is not predominantly informative. Half of the advertisement is devoted exclusively to attracting the listener's attention and interest while conveying virtually no factual information related to the need for or competence of counsel. On the other hand, an ad that commenced with a depiction of an automobile accident or otherwise very briefly dramatized the need for a lawyer would comply if that were but a small part of the entire ad, both in quantity and quality—in other words, if it were but a minor part of an otherwise rational appeal, the balance of the ad describing the firm, its experience, its availability, its fees, its clients, etc.

In this connection we note that the most common form of print advertising by attorneys simply states the kinds of cases the firm handles and the fact that initial consultations are free. Often added is the fact that for a particular kind of occurrence, the consumer may have a right to damages. Such an ad would comply fully with our regulation. It is completely informational and contains no non-rational aspect whatsoever. Given the limited scope of our certification of attorney expertise and the limitations on advertising of quality, lawyers may see little

alternative to the unadorned statement that, *e.g.*, they handle personal injury claims. In fact, much more is permitted. The Comment to RPC 7.2 provides:

> This Rule permits public dissemination of information concerning a lawyer's name or firm name, address and telephone number; the kinds of services the lawyer will undertake; the basis on which the lawyer's fees are determined, including prices for specific services and payment and credit arrangements; a lawyer's foreign language ability; names of references and, with their consent, names of clients regularly represented *and other information that might invite the attention of those seeking legal assistance.* [Emphasis supplied.]

A knowledgeable consumer would want much more information than the field of practice and the availability of a "free consultation" before giving any serious consideration to the firm, since such an ad provides really nothing relevant to the wisdom of selecting it except the fact that it will accept and desires such kind of work. The point here is that the ad does not become "non-informational" or "irrational" simply because it lacks *significant* information. As noted below, the Committee will be empowered to *require* the inclusion of more information if, on balance, it deems that wise.

Despite the foregoing, we have decided to continue more substantial restrictions on television advertising. There is no doubt that the potential impact of irrational factors is greatest in that medium. *See Matter of Felmeister*, 95 *N.J.* 431, 440–41 (1984). Furthermore, the group that has the least access to informed sources on attorney skills and might rely most heavily on television for information, the less-affluent, less-educated public, is the most vulnerable to this kind of ad. The other side of the coin is that such restrictions will impair the effectiveness of the ad and perhaps thereby reduce some of the benefit that attorney advertising might have for this income group, whose needs for information about legal services are greater than those of other groups. We continue the restriction in the case of television advertising subject to the future evaluation provided for in this opinion. We will learn in time through our experience (in dramatizations on radio, for example) about the effectiveness and ineffectiveness of attorney advertising with

and without emotional appeal, as well as their potential for harm. Our conclusion is ultimately based upon the belief that the risk may be substantial and that our duty is to protect the public against it. We believe that whatever loss there may be in effectiveness is worth the advantages of protecting the public from that risk during a trial period.

There is one other kind of ad that our regulation addresses. Although probably few in number, since we believe there are very few attorneys who would run such an ad even if it were permitted, its adverse impact can be substantial. We refer to the kind of advertisement whose attention-getting technique depends upon its absurdity, its clear and intentional lack of relevance to the selection of counsel. It is different from the ad that has an irrational component designed to supplement a rational factual message. The type of ad referred to here has a "shock" quality in its absurdity. For example, the overweight man emerging from a swimming pool with a scuba diver outfit on, who announces that he is Lawyer Smith and that "this" (then pulling a somewhat overweight woman out of the water to join him) is his receptionist,[11] produces not only interest but a laugh and, often enough, a smirk. The serious viewer wonders why an attorney thinks someone would be interested in his services based upon such an ad; indeed the scene is so patently unrelated to any qualities that rationally relate to the attorney's competence as to cause the viewer to wonder what that attorney thinks of the public. Ultimately this effort to obtain clients through such a patently irrational appeal gives one cause to question the competence of both the attorney who ran the ad and the court that allowed it. In short, such an ad has the potential for bringing both the bar and bench into disrepute.

This is not to say that the bar and bench should be immune from criticism, or even ridicule, in attorney advertising. The point is that attempts to obtain clients should not be allowed to

[11]*See* 114 *N.J.L.J.* 668 (Dec. 27, 1984).

be so extremely divorced from the consumer's informational needs or to have the twin adverse effects of attracting some consumers through their shock value while antagonizing others—against both the bar and bench—through their insult to the consumer's intelligence. Shock and absurdities may have great value in making a message effective. Their potential damage in attorney advertising, however, far exceeds any benefit derived from this effectiveness. The appearance in any attorney advertisement of that kind of appeal is totally prohibited, no matter how small a part of the ad it may be. This Court has a duty not only to prevent attorneys from securing clients through non-rational means, but also to preserve such confidence as the public may now have in the bench and the bar from the effect of extreme portrayals of counsel as a buffoon, a clown, or, more generally, a person having none of the qualities that the consumer should consider in selecting a lawyer. While resembling it, the restriction is much narrower than our prior "dignity" requirement and can be more easily and evenly applied.

### III.

We believe our new regulation complies, both in letter and spirit, with the constitutional limitations on our power to restrict attorney advertising. The test ordinarily applied in determining the constitutional validity of restrictions on commercial free speech is found in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341 (1980). If the proposed material is truthful and not misleading, either inherently or in practice, the state, in order to justify the restriction, must show first that it is sought in order to serve a substantial state interest, second, that in fact the restriction does directly serve that interest, and third, that there is no less restrictive alternative available to accomplish the same effect. *Id.* at 566, 100 *S.Ct.* at 2351, 65 *L.Ed.*2d at 351.

The rulings at the Supreme Court level concerning attorney advertising specifically thus far are *Bates, In re Primus,* 436 *U.S.* 412, 98 *S.Ct.* 1893, 56 *L.Ed.*2d 417 (1978), *Ohralik v. Ohio State Bar Association,* 436 *U.S.* 447, 98 *S.Ct.* 1912, 56 *L.Ed.*2d 444 (1978), *In re R.M.J.,* 455 *U.S.* 191, 102 *S.Ct.* 929, 71 *L.Ed.*2d 64 (1982), and *Zauderer. Bates* decided that various asserted state interests did not warrant a total ban on attorney advertising of routine services and their prices. Included among the interests asserted was the alleged tendency of lawyer advertising to erode the dignity of the legal profession. *Bates* ruled *not* that this interest might not justify *some* restriction on attorney advertising, but rather that it did not justify the total ban. *See* 433 *U.S.* at 367–72, 97 *S.Ct.* at 2700–03, 53 *L.Ed.*2d at 826–28. *Bates* noted that the legal profession was sufficiently different from other activities as perhaps to warrant special rules, *id.* at 383, 97 *S.Ct.* at 2708, 53 *L.Ed.*2d at 835, implying that important state interests might be involved allowing for greater regulation in connection with attorney advertising than with other commercial free speech. *In re Primus* decided that a civil liberties lawyer's offer of free legal representation constituted protected political speech, and on the same day *Ohralik* held that attorney in-person solicitation for pecuniary gain could be completely prohibited.

*In re R.M.J.* held that the state's attempt to restrict attorneys in advertising their field of practice to a limited laundry list was unconstitutional when applied to an attorney who had selected a different and better description that was completely truthful and non-misleading. While the Court's language at times appeared to allow only one restriction on attorney advertising, namely that it be truthful and non-misleading, the Court explicitly indicated that further regulation was possible if the regulation passed the *Central Hudson* test of serving a substantial state interest, directly promoting that interest, and being the least restrictive alternative available. 455 *U.S.* at 203, 102 *S.Ct.* at 937, 71 *L.Ed.*2d at 74.

Finally, *Zauderer* held that the state could not prohibit either truthful non-misleading advertising indicating an attorney's experience with a particular kind of litigation and containing limited legal advice (concerning the statute of limitations), or non-deceptive illustrations that not only attract attention to the ad but convey information. Even though illustrations can be deceptive, that potential, the Court held, does not warrant the total prohibition attempted by the state, but rather requires the state to examine each matter on a case-by-case basis to determine whether in fact the illustration is misleading. 471 *U.S.* at 649, 105 *S.Ct.* at 2281, 85 *L.Ed.*2d at 671. The Court again noted that conformance with the truth was not the only conceivable basis for regulating commercial speech, but that there might be other kinds of restrictions designed to serve a substantial state interest in accordance with the *Central Hudson* formulation. *Id.* at 638, 105 *S.Ct.* at 2275, 85 *L.Ed.*2d at 664.

Nothing in today's attorney advertising regulations offends the principles laid down in these decisions. Our rule contains no restriction against advertising prices for routine services (*Bates*), solicitation for first amendment-connected litigation (*Primus*), advertising fields of practice by any name (*In re R.M.J.*), or advertising counsel's experience with particular litigation along with legal advice and an informative illustration (in print), none of which is deceptive (*Zauderer*). We are convinced, furthermore, that each of the special regulations for attorney advertising adopted in this opinion—that the ads be predominantly informational, that illustrations, dramatizations, lyrics, music, etc., are prohibited in television ads, and that extreme portrayals of counsel are totally prohibited—is constitutionally permissible under the *Central Hudson* test.[12]

---

[12]This defense of the new rule proceeds on a broad plane, since there is no specific attack on it "as applied," but rather a facial attack on the "dignity" requirement as well as the prohibition against illustrations, dramatizations, etc., an attack that we will assume is made on the requirements not heretofore applied, the "predominantly informational" and "extreme portrayal" restric-

Preliminarily, we note that these non-content based regulations might be regarded as dealing with the manner of advertising and therefore subject only to the constitutional limitations on state action affecting the "time, place or manner" of commercial free speech. *See generally* Andrews, "Lawyer Advertising and the First Amendment," *Am.B.Found.Research J.* 967, 1009–13. The suggestion that justification of these restrictions under the "time, place and manner" doctrine would require a showing that there is something about attorney advertising different from other advertising, *id.* at 1012, resembles an equal protection attack. As the United States Supreme Court recently noted, the "rational basis" test applied to equal protection claims of improper economic or social classification is invariably satisfied if the first and second prongs of the *Central Hudson* test are complied with, that is, if the restriction directly serves a substantial state interest. *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 *U.S.* ——, —— n. 9, 106 *S.Ct.* 2968, 2979 n. 9, 92 *L.Ed.*2d 266, 283 n. 9 (1986). We will therefore test each of our three new regulations, in turn, for

tions. While such a defense cannot validate these restrictions against all possible "as applied" attacks in the future, we believe the constitutional principles involved as well as the interests sought to be served, along with the probable format of attorney advertising, are all well enough known to render our facial determination probably dispositive in most cases; and certainly very much needed for the guidance of the bar.

We note that we have not subjected this new rule to the notice and hearing procedures that are now customary in this state. The opportunity for all, including the organized bar, to be heard on the general issue of attorney advertising (as well as on our present restrictions) was, however, provided not only by the Attorney Advertising Committee but also in this litigation, to which the NJSBA was a party and in which opposing views were presented by petitioner. Since the new rule is, to a great extent, based on the views and information previously elicited with respect to the old rule, and since there will be further hearings (before January 1, 1988) on the new rule after we have had some experience with it, we concluded that further hearings now were unnecessary.

compliance with *Central Hudson,* apparently the most rigorous of the arguably applicable tests.[13]

## A.

Applying *Central Hudson* to the "predominantly informational" requirement, we assume that the ad is truthful and that, therefore, the restriction must be justified first by showing that it is designed to serve a substantial state interest. The state's interest here is assuring that citizens' decisions about their need for counsel and their selection of counsel are rationally rather than emotionally determined. The mere statement of this interest is, we believe, sufficient to prove its importance. We have heard no suggestion from any quarter that the questions of the need for and selection of counsel are not important or that these important decisions are best made irrationally.

---

[13]More "rigorous" in the sense that the usual formulation of the test of validity for "time, place and manner" restrictions is that they be "rational," whereas *Central Hudson* requires more. In that connection the trial court concluded that the burden of persuasion (that the *Central Hudson* test was satisfied) is on the party asserting the validity of the restriction—a proposition with which we agree. Those attempting to restrict speech are always given the burden to justify the restriction. That court further concluded that the "standard of proof" applicable in meeting that burden was "clear and convincing," as compared to the usual alternatives of "preponderance" or "beyond a reasonable doubt." Since most of the critical standards under *Central Hudson* require what are essentially value judgments rather than factual conclusions, it is not clear to us what role is to be ascribed to the "clear and convincing" test, ordinarily used to describe the level of proof needed to justify a factual conclusion. In any event, we find no support for the "clear and convincing" requirement, which, while certainly the settled burden on the state in proving facts in a disciplinary proceeding against an attorney, has never been suggested as applicable to either the factual findings or the judgmental conclusions involved in applying *Central Hudson. Cf. Durham v. Brock,* 498 *F.Supp.* 213, 220 (M.D.Tenn.1980) (state's "burden is to prove by a preponderance of the evidence that advertisements of the type which are prohibited [by the attorney advertising rules] are inherently false, misleading, or deceptive"). We therefore conclude that, to the extent fact-finding issues are involved, the appropriate burden is on the state (really on this Court) to prove those facts by a preponderance of the evidence, although the clarity of the facts in this case is such that the "clear and convincing" standard would also be met.

This self-evident proposition is sometimes countered by one deemed equally self-evident—that our advertising law should trust the consumer to use his own good sense in sorting out the rational from the irrational, the important from the unimportant. This point of view is presented, for instance, in Andrews, *supra,* 1981 *Am.B.Found.Research J.* at 994–95, which discusses the validity of a requirement—similar to that of our new rule—that information in a lawyer's advertisement must be "relevant" in determining whether to seek the lawyer's services. The author notes that under such a test, "an advertisement mentioning the color of an attorney's eyes might be deemed irrelevant." *Id.* at 994. We agree. Moving another step on the scale, the author suggests that the state might also deem the availability of free parking as irrelevant. *Id.* We disagree, and find ourselves able to distinguish between eye coloration and free parking in terms of relevancy to the decision about selecting counsel. The heart of the author's objection to the kind of test we adopt is, however, contained in the following discussion:

> These potential state interests in declaring information about a lawyer or his or her firm to be misleading or irrelevant boil down to a fear that people will choose lawyers for the wrong reasons and, presumably, suffer the consequences of having a lawyer who may be inappropriate for them. Yet the government does not require that people buying products choose their product for laudable reasons. When a consumer chooses a product because a celebrity uses it or it comes with a sweepstakes ticket, the government does not assert that there is a sufficient interest to intervene in some way. If anything, there should be less reason to interfere with consumers' choice of attorneys and other professional services providers than with a choice of products. The quality of professional services is itself regulated initially by the bar exam and then by the state ethics codes and thus, if a client *does* choose an attorney for the wrong reasons, there are independent reasons to suppose that the attorney will do an adequate job. [*Id.* at 995.]

We do not believe that the Constitution requires that the rules governing attorney advertising be the same as those applicable to beer, automobiles, or casino hotels. The Supreme Court has not so held. *See* "The Supreme Court, 1984 Term," 99 *Harv.L.Rev.* 120, 201–02 (1985) (Harvard Note). There is a significant difference in the level of consumers' knowledge (or

ignorance) of material products and related services and their knowledge of legal services. There is also a significant difference in the importance of the rationality of their selection. In other words, not only is it less likely that the consumer will be "taken in" by the emotive quality of a refrigeration ad as opposed to a legal services ad, and thereby select an inferior product, it is also less important: the state has less interest in the kind of refrigerators consumers buy than in the kind of lawyers they choose. Refrigerator salesmen are not charged with fiduciary responsibilities toward those with whom they do business, nor do many determine whether our citizens are accorded their legal and constitutional rights. That the refrigerator manufacturer is not subjected to the equivalent of a bar exam should suggest not that the potential consumer of legal services needs *less* protection, but that this service, legal services, is *so* important as to require such an exam, and that the importance does not cease upon the exam's completion.

The FTC's study is similarly inapposite because of its focus on purely commercial considerations and quality of services. It notes, in repeating its assertions in its *amicus curiae* brief in a particular case:

> Restrictions which diminish an attorney's ability to communicate effectively and truthfully about the availability of legal services will make advertising less cost-effective and may tend to discourage its use altogether. As effectiveness diminishes and advertising costs increase, lawyers will be less likely to advertise. Competition between legal service providers, along with the provision of useful information to consumers about legal problems and the cost and availability of legal services, will be frustrated as a result. [FTC Report, *supra*, at 151.]

We agree generally with this observation. But it is simply the beginning of the analysis. The FTC study does not attempt to measure this adverse effect of restrictions against the adverse effect of no restrictions. In fact the report addressed no more than the impact of restrictions on the market price of services and the impact of wider dissemination of truthful information concerning services. The study does not address the impact of unrestricted advertising upon the consumer not entirely savvy

in the selection of legal services. We feel the FTC concerns, while important, are far from the only ones.

In our opinion, none of these assertions about the alleged difficulty of line-drawing, curtailment of information to the consumer, and stifling of competition is sufficient to vitiate the substantiality of the state's interest in assuring that citizens make legal services decisions in a rational manner. We therefore conclude that the "predominantly informational" requirement satisfies the first part of the *Central Hudson* test.

The second part of the *Central Hudson* test requires that the restriction *directly* serve the substantial state interest involved. That interest here is assuring that consumer decisions in selecting counsel are rational; the direct relationship between the "predominantly informational" restriction and the state interest is apparent.

Finally, *Central Hudson* requires that the restriction be the "least restrictive alternative" necessary to achieve the result. It is generally agreed that the only alternatives to restrictions in this field are requirements of disclosure. There are, in other words, only two ways to protect the consumer from an advertiser: requiring the advertiser either to delete the material that constitutes the risk or to disclose explicitly other material pointing to the risk and thereby enabling the consumer to protect himself against it. The alternative to the "predominantly informational" standard would be to require lawyers to note, for example, that their dramatization is irrelevant to the selection of counsel, and that counsel should be selected only after careful deliberation, including concern for certain factors which would thereafter be listed.

We have some doubt about the applicability in this case of the United States Supreme Court's assertion under somewhat different circumstances that it is up to the Legislature (in this case up to this Court) to decide whether restrictions in speech or disclosure requirements are more effective. *Posadas de Puerto Rico Assocs. v. Tourism Co., supra,* 478 *U.S.* at ——,

106 *S.Ct.* at 2978, 92 *L.Ed.*2d at 282. Justice Brennan's dissent was of the opinion that the absence of a less restrictive alternative must be proven. *Id.* at ――, 106 *S.Ct.* at 2985, 92 *L.Ed.*2d at 291. The record before us is bare on this issue. We believe, however, that we may take judicial notice of the absence of experience in this field on the basis of which one might arrive at an informed judgment as to the effectiveness of disclosure requirements incorporated in presumably otherwise emotional ads. Given that absence of experience, we may rely on our own knowledge, which suggests that a less restrictive alternative in the form of disclosure would be both impractical and less than effective in achieving the same goal as that achieved by the restriction. We take it that to constitute a "less restrictive alternative" the alternative must achieve the same or substantially the same goal as the more restrictive alternative. Given the present state of relative ignorance about attorney services, we conclude that disclosures explicitly advising the listener or viewer not to succumb to the irrational appeal of the ad but to seek out information rationally related to his need for and selection of counsel would be more likely to befuddle than to enlighten. Mandatory disclosure will enhance the rationality of an ad, but only as a supplement to—not as a substitute for—our requirement that the ad itself be "predominantly informational."

## B.

Analysis of the special television restrictions in our rule proceeds along similar lines. As the record before us and the general literature abundantly prove, the emotional impact of television advertising, in its ability to persuade subliminally, through symbols, music, drama, authority figures—the entire host of emotive non-rational techniques—far exceeds that of the print media and radio. There is therefore a reason to distinguish our treatment of emotive elements that appear in print or are broadcast on the radio from those that would appear on television. Indeed, the difference is so marked that

the Supreme Court appears to have limited its holdings to date to media other than television.[14]

The state interest sought to be served by the restriction on television advertising is the prevention of undue irrational influence on consumers in their selection of counsel. It is the same interest as supports the "predominantly informational" test. Our conclusion is that the danger, in television advertising, of such non-rational techniques is so great that even restricting them to the point where the entire ad is *"predominantly* informational" is not sufficient protection. We are concerned that the picture, dramatization, or music minimally necessary to attract and hold interest in a television ad may exceed the limits required to protect the consumer. We note that this limitation involves no content restriction at all; the same information that may be used in other media is permissible on television. Nor do our regulations, as a whole, prohibit *all* use of non-rational techniques; drawings and the like are simply restricted to print and radio broadcasting where they are limited in scope. The regulation directly advances the interests sought to be served and its purpose cannot be achieved by any less restrictive alternative—the analysis of both these questions being similar to that provided above in connection with the "predominantly informational" restriction.

---

[14]*See Zauderer v. Office of Disciplinary Counsel, supra,* 471 *U.S.* at 647, 105 *S.Ct.* at 2280, 85 *L.Ed.*2d at 670 ("An attorney may not be disciplined for soliciting legal business through *printed* advertising containing truthful and nondeceptive information and advice regarding the legal rights of potential clients") (emphasis supplied). Justice O'Connor's opinion in *Zauderer* explicitly reads the majority opinion as expressing no view as to whether the ruling applies to broadcast media, commenting that " 'the special problems of advertising on the electronic broadcast media will warrant special consideration.' " *Id.* at 673, n. 1, 105 *S.Ct.* at 2294 n. 1, 85 *L.Ed.*2d at 687 n. 1 (O'Connor, J., concurring in part and dissenting in part) (quoting *Bates v. State Bar of Arizona,* 433 *U.S.* 350, 384, 97 *S.Ct.* 2691, 2709, 53 *L.Ed.*2d 810, 836 (1977)). *See also* Harvard Note, *supra,* 99 *Harv.L.Rev.* at 199 (stating that the *Zauderer* Court "apparently limit-[ed] its holding to printed advertising").

In general we agree with the observations of the Iowa Supreme Court that:

> Electronic media advertising, when contrasted with printed advertising, tolerates much less deliberation by those at whom it is aimed. Both sight and sound are immediate and can be illusive because, for the listener or viewer at least, in a flash they are gone without a trace. Lost is the opportunity accorded to the reader of printed advertisements to pause, to restudy, and to thoughtfully consider.
>
> [*Committee on Professional Ethics & Conduct v. Humphrey*, 377 *N.W.*2d 643, 646 (Iowa 1985) (footnote omitted), *app. dism. for want of a substantial federal question*, —— *U.S.* ——, 106 *S.Ct.* 1626, 90 *L.Ed.*2d 174 (1986).]

The lack of untoward results, mentioned by the trial court, in states with less restrictive regulation on television ads does not seem to us persuasive. Besides the fact that attorney advertising is in its infancy, very few states have a geographical status similar to that of New Jersey, situated between two of the largest legal establishments in the country, Philadelphia and New York City. Given their right to use their firm names in New Jersey and, through New Jersey attorneys, to carry on the practice of law here, concern in this state for the potential adverse consequences of highly competitive television advertising is particularly well-grounded.

We note again the United States Supreme Court's dismissal of the appeal in the *Humphrey* case. Such a dismissal is generally considered to be a Supreme Court holding on the merits as to those questions properly before the Court. *Hicks v. Miranda, supra,* 422 *U.S.* at 344–45, 95 *S.Ct.* at 2289, 45 *L.Ed.*2d at 236. The question before the Supreme Court in *Humphrey* was whether Iowa's rule barring attorney television advertisements that contained background sound, visual displays, more than a single non-dramatic voice, or self-laudatory statements was constitutionally valid.[15] The case had been

---

[15]Specifically, the questions presented in the appellants' jurisdictional statement were:

1. Do the standards established by this Court under the First Amendment for regulating lawyer advertising apply to advertising on television?

remanded to the Iowa Supreme Court, after that court's initial decision sustaining its rule, for reconsideration in light of *Zauderer. Humphrey v. Committee on Professional Ethics & Conduct,* 472 *U.S.* 1004, 105 *S.Ct.* 2693, 86 *L.Ed.*2d 710 (1985) (mem.), *vacating* 355 *N.W.*2d 565 (Iowa 1984). On reconsideration the Iowa Supreme Court continued to sustain its rule, taking the position that the United States Supreme Court did not intend to limit the states' power in regulating television advertising in the same way it had in connection with print advertising. Under the *Hicks* doctrine, by dismissing the subsequent *Humphrey* appeal for want of a substantial federal question, the United States Supreme Court held, in effect, that a state may bar use of these various techniques in conjunction with lawyer television advertising without offense to the United States Constitution. We do not base our conclusion on that observation, however, for we believe it is more likely that the Supreme Court, like this Court, is inclined to allow states to continue restrictions in order to see what further experience evolves from their application before making any final constitutional determinations.[16] While we find support from the United States Supreme Court's dismissal of the *Humphrey* appeal in view of the *Hicks* doctrine, we rest our conclusions basically on

---

2. Are Iowa's rules banning "dramatic" voices and "self-laudatory" statements in lawyer advertising impermissibly vague, on their face or as applied?

[Appellants' Juris. Statement, *Humphrey v. Committee on Professional Ethics & Conduct* (Feb. 11, 1986).]

[16]In that connection we note that such dismissals do not have the same authority for the Court itself as decisions that are a product of plenary proceedings, *Metromedia, Inc. v. City of San Diego,* 453 *U.S.* 490, 500, 101 *S.Ct.* 2882, 2888, 69 *L.Ed.*2d 800, 810 (1981); C. Wright, *The Law of Federal Courts* § 108, at 758 n. 25 (4th ed. 1983), and that commentators have argued that these dismissals *should* have little weight because they really do not differ greatly from denials of *certiorari, see, e.g.,* Comment, "The Precedential Weight of a Dismissal by the Supreme Court for Want of a Substantial Federal Question: Some Implications of *Hicks v. Miranda,*" 76 *Colum.L.Rev.* 508, 511 n. 19, 518–19 (1976).

our own analysis of the interests involved in the regulation of attorney advertising and the application of *Central Hudson* to those interests.

## C.

As for our restriction prohibiting "extreme portrayals," the kind of ad whose attention-getting technique depends upon its absurdity, its clear and intentional lack of relevance to the selection of counsel, the state interest served is the preservation of public confidence in the bar and the bench. Such ads are few and far between because they pose the distinct risk of alienating the public instead of attracting it. This risk, however, is not confined to the lawyer who runs the ad, but extends to the entire bar. We do not believe an expert is needed to demonstrate that a substantial number of people seeing or hearing such an ad (an example is provided *ante* at 530) would be disgusted not only with the lawyer running the ad, but generally with the bar, and additionally with the court that permits it. The impingement on free speech is minimal for, almost by definition, this kind of speech includes no factual information; furthermore, there are adequate alternatives for gaining attention without creating the contempt for the profession that arises from such extreme ads. Our prohibition directly serves the state interest involved, and there is obviously no less restrictive alternative.

We are satisfied that preservation of public confidence in the legal profession represents a constitutionally sufficient interest to support this limited restriction on the attorney's right to advertise. The contention that the slightest amount of attorney advertising will destroy professionalism has, of course, been adequately demolished in various opinions of the United States Supreme Court and other courts throughout the nation. But no court has had the temerity to suggest that unrestricted advertising poses absolutely no threat to those qualities of the profession that positively and importantly serve the public

interest, and this Court has an especially strong obligation to maintain and promote these qualities. Attorneys in this state are as highly regulated as anywhere else, we believe. Our Rules of Professional Conduct are generally stricter than those of most states; our Clients' Security Fund is as well structured as any; the dedication of our State Bar Association to public interest comes second to none. Literally thousands of lawyers every year donate their services without public recognition both to needy clients and to the administration of justice. There are Early Settlement Panels conducted by lawyer volunteers and similar alternative dispute mechanisms that help prevent what would otherwise be an intolerable increase in the cost of justice. And in special situations, we know of no attorney who has ever refused the call of this Court to give service to the public without charge. It is unfortunate that the image of attorneys, according to public opinion surveys, apparently remains unfavorable. If that is ever to change, we suspect it is as likely to change here as anywhere else.

In short, the profession in New Jersey and its qualities represent, in our judgment, an important public interest worth preserving. If unrestricted advertising by attorneys represents a threat to the qualities of that profession that serve society, it is clearly our responsibility to guard against it.

## D.

Our rulings here must confront the general constitutional requirement, not always articulated, and not always followed, of factual proof of the existence of the legal justification for restricting free speech. Ordinarily it will not do simply to note the circumstances that, under *Central Hudson,* will justify restrictions on commercial free speech, and then "prove" their existence by logic, anecdote, or notions of what is "generally accepted." *Record* proof is required. *See, e.g., In re R.M.J., supra,* 455 *U.S.* at 205–06, 102 *S.Ct.* at 938–39, 71 *L.Ed.*2d at

76; *Schad v. Borough of Mount Ephraim*, 452 *U.S.* 61, 72–73, 101 *S.Ct.* 2176, 2184–85, 68 *L.Ed.*2d 671, 683, 685 (1981).

The rule, however, is apparently not quite so rigid. In *Ohralik*, for instance, the substantial state interest that justified a *total ban* on in-person solicitation for pecuniary gain under certain circumstances was that, under those circumstances, lawyers are likely to be able to coerce clients in a manner inimical to the client's interest in retaining the attorney. A reading of both the United States Supreme Court and Ohio Supreme Court opinions makes it clear that there was no record support for the proposition that this kind of adverse effect will occur sufficiently often to warrant the prophylactic rule.[17] And in *Posadas de Puerto Rico Associates*, the Court accepted as constitutionally sufficient Puerto Rico's assertion that excessive casino gambling by commonwealth residents would produce serious harmful effects, notwithstanding a dissenting opinion's vigorous objection that the record before the Court contained no proof whatsoever of this assertion. 478 *U.S.* at ——, 106 *S.Ct.* at 2984–85, 92 *L.Ed.*2d at 289–90 (Brennan, J., dissenting). As the Supreme Court said in *Zauderer:* "When the possibility of deception is as self-evident as it is in this case, we need not require the State to 'conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead.'" 471 *U.S.* at 652–653, 105 *S.Ct.* at 2283, 85 *L.Ed.*2d at 673 (quoting *FTC v. Colgate Palmolive Co.*, 380 *U.S.* 374, 391–92, 85 *S.Ct.* 1035, 1046, 13 *L.Ed.*2d 904, 918 (1965)).

Given the lack of substantial reliable knowledge as to the effects of attorney advertising,[18] we believe the Constitution

---

[17]While *Ohralik* might be distinguished by noting its assertion that speech is only a subordinate component of an in-person solicitation, 436 *U.S.* at 457, 98 *S.Ct.* at 1919, 56 *L.Ed.*2d at 454, it is clear that the Court nonetheless subjected the prohibition to first amendment scrutiny, *id.*

[18]*See* note 4 *supra.* The trial court in this case specifically found that "[a]ll experts and counsel agreed that no empirical research exists as to the effect of

allows the state (here this Court) to use common sense and that which it believes is common knowledge in determining the likely facts, the certainty of which will be disclosed, if at all, only after many years of experience. We do not believe that the first amendment requires a state to abandon the pursuit of what it sincerely and reasonably believes to be substantial state interests simply because, in the nature of things, conclusive proof is lacking. The record before us demonstrates that non-rational ads will persuade consumers to select lawyers. Everything we know about the administration of justice and the representation of clients convinces us that rational selection of counsel serves not only the client's interest, but the public interest. What we cannot demonstrate, because of the absence of empirical data, is just how substantial the adverse effects of non-rational selection of counsel will be.

We believe that under these circumstances the Constitution allows us to do what any responsible governmental entity charged with protecting consumers and preserving professional values would do, namely to be cautious, to move slowly. The essential method of achieving the best balance in uncharted waters such as these is the pilot project, the testing, the tentative probe, not a final dogmatic pronouncement and its accompanying rule proclaimed to strike, once and for all, the balance between free speech and whatever other interests may be involved. The Constitution requires no such heroics; it allows us to act with the humility appropriate to our ignorance. So long as we leave the door open to proof that we are wrong—and we do here in many ways, including allowing non-rational ads, within limits, in both print and radio broadcast media, and assuring further consideration of the restrictions within a year—the public's interest in the potential benefits of more robust commercial free speech in this area is, we believe, sufficiently recognized.

---

undignified advertising, nor the effect of the use of the specifically proscribed techniques."

For all of these reasons, we adopt the rule described above and set forth in the Appendix, fully intending to monitor its impact and, if necessary, and we believe it may be necessary, to revise it from time to time until it seems to meet all of the needs apparently involved, including consumer information, consumer protection, and the preservation of those qualities of the legal profession that serve society.

## IV.

We note two other issues arising from the trial court's proceedings. The trial court found that the "dignity" standard was constitutionally valid, listing sixteen other jurisdictions that have such provisions in their applicable rules. We note that the only two cases we have been able to find that squarely consider the constitutionality of the dignity standard uphold it against first amendment and void-for-vagueness challenges. *Spencer v. Supreme Court*, 579 *F.Supp.* 880 (E.D.Pa.1984), *aff'd without opinion*, 760 *F.*2d 261 (3d Cir.1985); *Bishop v. Committee on Professional Ethics*, 521 *F.Supp.* 1219 (S.D.Iowa 1981), *vacated on other grounds*, 686 *F.*2d 1278 (8th Cir.1982). We know of no case holding the standard unconstitutional,[19] although influential commentators have argued that it does not conform to the first amendment. G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 512–14 (1985); Andrews, *supra*, 1981 *Am. B. Found. Research J.* at 1009–13. We choose not to adopt the standard for reasons other than constitutional questions. We believe it is difficult to apply and that the interests

---

[19]We note, however, that in *Zauderer* the Supreme Court stated that "we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgement of their First Amendment rights." 471 *U.S.* at 648, 105 *S.Ct.* at 2280, 85 *L.Ed.*2d at 670. This statement was *dicta,* however, and certainly does not constitute, even though it may signal, the Supreme Court's rejection of a dignity standard for attorney advertising. *See* Harvard Note, *supra,* 99 *Harv.L. Rev.* at 198.

requiring protection can be served through the standards adopted in our rule without the same difficulty of application. We do not, however, totally reject the possibility that, if necessary, we may adopt the dignity standard in the future.

Another issue arises from the New Jersey State Bar Association's contention that it should be completely exempt from these regulations. Despite the appeal of the NJSBA's position, we cannot allow the discrimination.

The NJSBA supported RPC 7.2(a) as applied to the ordinary practice of attorneys. It suggested, with justification, that the interests to be served by such regulation are not involved in the NJSBA's consumer education and other similar programs. We agree, but believe that such a distinction would be unwise. Clearly, any ad by the NJSBA intending to or having any tendency to direct consumers to particular attorneys or particular groups of attorneys (such as ads that suggest the advantages of the NJSBA's "lawyer referral services") should conform to the new rule. While even those ads are less likely to threaten the interests mentioned herein (since the NJSBA has no financial interest in securing these clients), we conclude that the possibility of unfair competition with the private bar requires a parity of treatment. NJSBA institutional ads pose a different problem. If the NJSBA may use drama or any other emotive technique, then any lawyer or firm could run its own "institutional" ad similarly free of restrictions. The potential for evading our regulation is obvious. Until we gain further experience, we shall apply the new rule to all attorney advertising, including institutional advertising.

## V.

As stated above, we deem it desirable to create an agency charged with implementing our new rule and achieving the goals mentioned herein: enforcing the rule, monitoring its impact, interpreting it, adopting rules and regulations, evaluating it, and reporting to this Court. The specific powers and

responsibilities of the agency (the Supreme Court Committee on Attorney Advertising) shall be:

(1) To determine compliance of particular attorney advertisements with our new rule (RPC 7.2(a)) and with the agency's rules and regulations promulgated under RPC 7.2(a) and (b), the agency's review triggered either by complaint or through its own surveillance and other knowledge.

(2) To determine compliance of particular ads with RPC 7.1, 7.2(b), (c), 7.3(a), (b), 7.4 and 7.5.

(3) To make findings of fact and of law in connection with such determinations where violations are found and to forward the record to the Disciplinary Review Board along with its recommendation of appropriate discipline.

(4) To refer, in its discretion, any factual issues, including questions of truthfulness, to the appropriate district ethics committee.

(5) To establish its own rules of procedure. The Committee may act either as a body or in panels of no fewer than three members, as determined by its chairman either on an ad hoc basis or in accordance with criteria established by the chairman.

(6) To adopt, after affording the bar an opportunity to comment and after approval of this Court, rules and regulations for the purpose of implementing RPC 7.2(a) and (b) consistent with those rules and this opinion in order to implement the explicit and implicit goals set forth therein and herein. Those rules and regulations may include disclosure requirements, restrictions beyond those set forth in 7.2(a), time, place and manner regulations, guidelines for determining the application of the "predominantly informational" and "extreme portrayal" requirements and, generally, any rule or regulation that is either necessary or desirable in clarifying the application of the rules, or making them more effective.

(7) To monitor the impact of RPC 7.1, 7.2, 7.3(a), (b), 7.4 and 7.5 in order to determine the extent to which those rules achieve their goals and those set forth herein, and the extent to which there is any need for revision; in particular, without limiting the generality of the foregoing, to monitor the impact of these rules to determine if consumers are obtaining enough information about their need for lawyers and to aid them in the selection of lawyers, if price competition is being achieved, if damage to the qualities of the profession that serve society is occurring, and if consumers are being damaged through non-rational appeals.

(8) To render advisory opinions, in its discretion, at the request of attorneys or firms or associations of attorneys in advance of the publication of any advertisement. If the advisory opinion approves of the ad, no disciplinary action shall be brought on account of its publication unless it is proven that the facts submitted to the Committee by the attorney were untrue. If the advisory opinion disapproves of the ad, its subsequent use shall constitute unethical conduct.

(9) To require, by rule, or in particular cases, in its discretion, any attorney or firm or association of attorneys that has hired an advertising agency, public relations counsel, or similar assistance for this purpose to submit to the

Committee, before publication, any series of ads, any advertising program, or any general public relations program including advertising or soliciting.[20]

(10) To encourage in such manner as seems effective the education of the public concerning rational means of selecting counsel and of determining whether counsel is needed.

In addition to the obvious practical benefits of the Committee, we believe that its function may dilute some claims of legal infirmity. For instance, the claim that our new rule is "vague" is weakened by the ability of an attorney to obtain an advisory opinion prior to publication. *See, e.g., Posadas de Puerto Rico Assocs. v. Tourism Co., supra,* 478 *U.S.* at ——, 106 *S.Ct.* at 2980, 92 *L.Ed.*2d at 285.

The Committee shall be staffed by the Administrative Office of the Courts initially, with at least one full-time employee. Staffing thereafter shall be determined by the experience of the Committee.

Perhaps the most important function of the Committee is its annual report, the first of which shall be submitted no later than January 1, 1988. Prior to that date the Committee shall conduct a public hearing on the desirability of retaining, revising, or repealing the new rule, or adopting any other proposed rule on attorney advertising. Given our belief concerning our lack of knowledge and experience in this field, we necessarily depend substantially on the knowledge and expertise that will be accumulated by the Committee; indeed, our need in this regard is an important reason for creating the Committee. The Committee should survey the experience of other states before

---

[20]The Supreme Court and lower federal courts have frequently noted that traditional concerns about prior restraint raised by forms of prepublication review such as the review procedure we permit today do not apply with the same force in the commercial speech context. *See, e.g., Central Hudson, supra,* 447 *U.S.* at 571 n. 13, 100 *S.Ct.* at 2354, 65 *L.Ed.*2d at 354 n. 13; *Kleiner v. First Nat'l Bank,* 751 *F.*2d 1193, 1205 (11th Cir.1985). We note, however, that the validity of our review process may depend on the Committee's adoption of certain procedural safeguards designed to protect against the abuses inherent in any form of prepublication review. *See Illinois Ass'n of Realtors v. Village of Bellwood,* 516 *F.Supp.* 1067, 1070–72 (N.D.Ill.1981); L. Tribe, *American Constitutional Law* § 12–36, at 734–35 (1978).

its initial report so that we might have the benefit of not only our own experience but also that of others. If special staff work is needed for that purpose, this Court will assign additional personnel as may be necessary. Nothing herein shall prevent the Committee from reporting more often, as it sees fit.

We direct the Committee's attention to its power to require disclosure. The Supreme Court has frequently noted that the best protection for consumers is not more restrictions, but more disclosure. *See, e.g., Central Hudson, supra,* 447 *U.S.* at 570–71, 100 *S.Ct.* at 2353–54, 65 *L.Ed.*2d at 354; *Village of Schaumburg v. Citizens for a Better Environment,* 444 *U.S.* 620, 637–38, 100 *S.Ct.* 826, 836, 63 *L.Ed.*2d 73, 88 (1980). Without accepting that observation for all purposes, we believe there is no question that disclosure may play an important part in attorney advertising and in achieving the balance of conflicting interests discussed in this opinion. We note, for instance, the Alabama disclosure provision requiring all advertising to contain the statement "[n]o representation is made about the quality of the legal services to be performed or the expertise of the lawyer performing such services." Ala.DR 2–102(A)(7)(f). Such a disclosure requirement may be advisable even as an addition to, rather than as a replacement for, our current prohibitions against unsupportable quality claims. Disclosure may not be able to cure ads that state "you may be entitled to a substantial recovery if you have been injured" or that "we will try to relieve the emotional strain arising from your matrimonial difficulties," and the like. In these circumstances perhaps only prohibition will suffice. We leave all of these questions to the Committee initially, including our hope that the Committee will determine how best to communicate the most needed information to consumers without the danger of misleading them, namely information about the quality of an attorney's service.

## VI.

Until relatively recently, our society accepted as inevitable the fact that, because of either economics or ignorance, legal

services were simply not available for a substantial portion of the populace. Today, in ways never before imagined, we are beginning to overcome this problem. As we struggle to determine how best to achieve that which had never previously been sought, we should not be discouraged, for the change has been breathtaking: in little more than two short decades, beginning with the creation of the Legal Services Corporation, we have taken great strides toward fulfilling the unmet needs of our citizens for legal services.

This Court's concerns that attorney advertising be restrained to the extent necessary to protect consumers and to preserve professional qualities beneficial to society are but small ripples in the waves of reform. We hope by these new rules to bring the benefits of attorney advertising to consumers of legal services: to help them better determine their need for and selection of counsel, and to encourage price competition among attorneys. We look to the day when justice will be done for all citizens, regardless of wealth. We know that advertising alone will not do it, but suspect that without advertising it will not be done.

To us it is clear that the initiative of the United States Supreme Court that commenced with *Bates* will ultimately greatly benefit our citizenry. It is sobering to note that while that proposition seems so clear today, its opposite seemed equally clear not so long ago. This observation gives us cause to be cautious, cautious both in restraining advertising and in permitting it. The truth is we simply have much to learn about the impact of attorney advertising and the impact of restrictions on attorney advertising. At this point all we can be confident of is the need for advertising, the potential benefits of advertising, and the legitimate claim of those who would advertise and those who would be helped by advertising to a policy limited not by their constitutional rights but by the public's need.

## APPENDIX

RPC 7.2  Advertising (Revised)

a.  Subject to the requirements of RPC 7.1 a lawyer may advertise services through public media, such as a telephone directory, legal directory, newspaper or other periodical, radio, or television, or through mailed written communication.  All advertisements shall be predominantly informational.  No drawings, animations, dramatizations, music, or lyrics shall be used in connection with televised advertising.  No advertisement shall rely in any way on techniques to obtain attention that depend upon absurdity and that demonstrate a clear and intentional lack of relevance to the selection of counsel; included in this category are all advertisements that contain any extreme portrayal of counsel exhibiting characteristics clearly unrelated to legal competence.

HANDLER, J., concurring in part and dissenting in part.

This case involves a challenge to two provisions of New Jersey's Rules of Professional Conduct (RPC) authorizing lawyers to advertise their services.  I agree with the Court that the prohibition of RPC 7.2(a) against the "use of drawing, animations, dramatization, music and lyrics" in non-television attorney advertising violates the first amendment protection of commercial speech.  I also agree with the Court's rejection of the rule requiring that all attorney advertising be "dignified".  The dignity-in-advertising standard, in my view, was unsound and unconstitutional.

The Court now rules that New Jersey's Rules of Professional Conduct can authorize lawyer advertising only when it is "predominantly informational."  I entertain serious doubts that this affirmative requirement governing the content of attorney advertising is necessary or wise.  Given the complexities of both lawyering and advertising, I am not confident that such a standard can be readily understood or fairly administered.  Moreover, it is likely to be applied narrowly and restrictively,

serving to censure advertising that is not misleading, confusing or deceptive. Because an information rule for advertising is problematic in terms of both constitutional law [1] and sound public policy, I would not include it in our advertising regulations. I therefore dissent.

## I.

Over the past decade, the United States Supreme Court has expounded the doctrine that the first amendment guarantee of commercial free speech assures attorneys, like other state-licensed professional persons, the right to advertise the availability of their services. *See Zauderer v. Office of Disciplinary Counsel*, 471 *U.S.* 626, 105 *S.Ct.* 2265, 85 *L.Ed.*2d 652 (1985); *In re R.M.J.*, 455 *U.S.* 191, 102 *S.Ct.* 929, 71 *L.Ed.*2d 64 (1982); *Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.*2d 810 (1977); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 *U.S.* 748, 96 *S.Ct.* 1817, 48 *L.Ed.*2d 346 (1977). *See generally Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341 (1980) (establishing a standard for evaluating the constitutionaity of restrictions on commercial speech).

---

[1]The court declines to address the constitutionality of its present rule under the New Jersey Constitution, despite the fact that the state constitution had been invoked by petitioner. *See ante* at 517 n. 3. This is unfortunate. Given the strong protection our state constitution gives to speech, *see, e.g., State v. Schmid*, 84 *N.J.* 535 (1980), *appeal dismissed sub nom. Princeton University v. Schmid*, 455 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982), it is at least open to question whether some of the restrictions of commercial speech upheld under the federal constitution might be invalid under the New Jersey Constitution. *See Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 *U.S.* ——, 106 *S.Ct.* 2968, 92 *L.Ed.*2d 266 (1986); *id.* at ——, 106 *S.Ct.* at 2982, 92 *L.Ed.*2d at 287 (Brennan, J., dissenting) (characterizing the restrictions upheld in *Posadas* as government attempts "to manipulate private behavior by depriving citizens of truthful information concerning lawful activities"); *see also* Case Comment, 100 *Harv.L.Rev.* 172 (1986) (reviewing *Posadas* ) (characterizing the *Posadas* opinion as creating a basis for eroding first amendment protections for commercial speech).

In *Zauderer, supra,* the Court applied an analytical standard that creates substantial doubt about justifying blanket restrictions on non-deceptive lawyer advertising:

> Our recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the cost of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful. The value of the information presented in appellant's advertising is no less than that contained in other forms of advertising—indeed, insofar as appellant's advertising tended to acquaint persons with their legal rights who might otherwise be shut off from effective access to the legal system, it was undoubtedly more valuable than many other forms of advertising.[2] [*Zauderer,* 471 *U.S.* at 646, 105 *S.Ct.* at 2279, 85 *L.Ed.*2d at 669.]

According to the majority lawful advertising is that in which "factual information rationally related to the need for and selection of an attorney predominates" "in both quantity and quality" over other material in the advertisement. *Ante* at 516 n. 1, 528. Much about this "predominantly-informational" standard is unclear.[3]

The difficulties in application are manifold. The standard apparently requires the separation of "rational information" from "other matter," clearly not an easy task. Assuming that the "rational information" appearing in an advertisement can

---

[2]On the issue of a "dignity" standard for attorney advertising, the Court stated:

> More fundamentally, although the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgement of their First Amendment rights. [*Zauderer,* 471 *U.S.* at 647–648, 105 *S.Ct.* at 2280, 85 *L.Ed.*2d at 670.]

[3]The majority deflects criticism about the difficulties in its proposed regulation by pointing to the tentative and experimental nature of the regulations and attorneys' ability to gain advisory opinions from the Committee on Attorney Advertising before publishing. *See ante* at 546–547, 550–551. However, given that problems of vagueness and subjectivity are deeply imbedded in the new standard, the Court's action may be considered an improvident delegation of powers to the committee—an invitation to inconsistent, arbitrary, and, inevitably, unconstitutional regulations of attorney free speech.

be identified and segregated, it would appear nearly impossible to quantify that information in order to determine whether it "predominates over" other material. It is hard even to imagine objective standards for evaluating and then comparing the "quality" (whatever that term may mean in this context) of the "rational" with the "other," presumably "irrational," elements of an advertisement. Nor is the basic requirement of permissible or allowable information in an advertisement readily understood. Information that is "rationally related to the need for and selection of an attorney" is not self-defining, and undoubtedly will engender differing views. For this Court to expect a committee to know what is "rationally related" appears chimerical. These considerations suggest that the judgments that will be asked of the regulating committee as to the affirmative content of advertisements would best be left to attorneys and to the public.

Similar concerns were considered by the Supreme Court in *Zauderer, supra,* which invalidated under the first amendment Ohio's discipline of an attorney on the basis of an advertisement that contained nondeceptive illustrations and legal advice. The Court reaffirmed the standard of evaluating restrictions on commercial speech:

> Commercial speech that is not false or deceptive and does not concern unlawful activities ... may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest. [*Zauderer,* 471 *U.S.* at 638, 105 *S.Ct.* at 2275, 85 *L.Ed.*2d at 664.]

Thus, for the Court affirmatively to require "predominantly-rational-informational" advertising, such a regulation must be found to be necessary either to eliminate false or misleading communications, or to further another substantial state interest. *See Central Hudson,* 447 *U.S.* at 566, 100 *S.Ct.* at 2351, 65 *L.Ed.*2d at 351.

With respect to such a state interest, the Court asserts that the proposed regulation "assur[es] that citizens' decisions about their need for counsel and their selection of counsel are rationally rather than emotionally determined." *Ante* at 535. The

Court then asserts that it is "apparent" that the regulation directly serves that interest. *Ante* at 538. The majority has asserted, but has made little effort to prove, that its standard calling for predominantly rational information can effectively further a substantial state interest. Moreover, there is a singular and dangerous risk entailed in the imposition of such a regulation. As noted both in this opinion and in the majority opinion, attorneys are already sharply restricted in communicating certain information—presumably "rational-information"—that would be important for consumers in making selections based on attorneys' skills. *See infra* p. 560; *ante* at 526–527. The Court's new "predominantly-rational-information" advertising standard is potentially inconsistent with existing strictures and therefore unlikely to promote the interest it purports to secure. Thus, the Supreme Court's response to Ohio's ban on illustrations on lawyer advertising could be applied in similar terms to the majority here:

> The State's arguments amount to little more than unsupported assertions: nowhere does the State cite any evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertisement cannot be combatted by any means short of a blanket ban. [*Zauderer*, 471 *U.S.* at 648, 105 *S.Ct.* at 2281, 85 *L.Ed.*2d at 671.]

It is also clear that the requirement that attorney advertising be "predominantly informational" is not necessary to counter the evils of false or misleading speech. Another rule, RPC 7.1, specifically serves this purpose. This rule forbids the publication of attorney advertisements that contain material misrepresentations or omissions.[4] *See N.J.S.A.* 56:8–2 (forbidding "any person" to advertise by using "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrep-

---

[4]RPC 7.1 also contains a specific ban on advertising that creates an unjustified expectation of results, a prohibition against comparison of the advertiser's services to those offered by other lawyers, and a limit on the information that may be published concerning fees. These specific proscriptions are only illustrative, and do not exhaustively identify the circumstances that may make communications subject to sanction. *See* Report of the Supreme Court Committee on Attorney Advertising (supplement to *N.J.L.J.*, 5 May 1981) at 5.

resentation, or the knowing, concealment, suppression, or omission of any material fact"); 15 *U.S.C.A.* § 45 (provision of the Federal Trade Commission Act that prohibits unfair or deception acts or practices).

Moreover, the Supreme Court's standard to determine whether an advertisement is misleading is sufficiently comprehensive to obviate any additional refinement to purge an advertisement of untruthful, deceptive, or confusing elements. *See R.M.J.*, 455 *U.S.* at 205–06, 102 *S.Ct.* at 938–39, 71 *L.Ed.*2d at 76 (a "relatively uninformative fact" in attorney's advertisement may be improper because "it could be misleading," not because it was "in bad taste"). In short, the purpose of RPC 7.2(a), as now pronounced by the Court, with its informational standard, is not to protect the public against attorney advertisements that are untruthful, deceptive, or confusing, which constitutes the primary basis for a restriction on free commercial speech.

I am satisfied that the requirement that attorney advertising of legal services be "predominantly informational" cannot be constitutionally justified. It does not further any substantial state interest nor is it essential to counteract public deception. On these grounds, this Court should not impose the informational requirement of RPC 7.2(a) but rather should be content with standards that prohibit false or misleading advertising.

II.

Even if the constitutionality of the informational standard were reasonably debatable, as a matter of public policy, there are strong and legitimate doubts about the majority's informational requirement.

A.

Restrictions on advertising must be analyzed within a larger context. First, many individual citizens do not understand their legal rights, and often do not act on the rights they do understand. *See Ohralik v. Ohio State Bar Ass'n*, 436 *U.S.* 447, 473

& n. 4, 98 *S.Ct.* 1925, 1927 & n. 4, 56 *L.Ed.*2d 444 (1978) (Marshall, J., concurring in part and concurring in the judgment). *See generally* Galanter, "Reading the Landscape of Disputes," 31 *U.C.L.A.L.Rev.* 4 (1983). Second, advertising by lawyers benefits—and a restriction on advertising burdens—a particular sub-population. Large law firms and large or sophisticated economic actors do not need lawyer advertising. *See* McChesney, "Commercial Speech in the Professions: The Supreme Court's Unanswered Questions and Questionable Answers," 134 *U.Pa.L.Rev.* 45, 66–74 (1985) [hereinafter "Unanswered Questions"]. "It is smaller law firms that systematically use more of the promotional inputs traditionally banned by state bars." *Id.* at 86; *see id.* at 86–90 (offering supporting data); *id.* at 91 ("The competitive implications of banning promotional inputs help explain a related phenomenon: large firms have vigorously opposed ending bans on advertising and solicitation despite the fact that they seem to have less interest in doing either"). We must recognize that the positions individuals take on lawyer advertising often reflect other disputes. Lawyer advertising deals not only with somewhat neutral matters like wills and divorces, but also with divisive matters like tort and worker compensation suits. There is some evidence that opposition to lawyer advertising comes from those affiliated with defending the suits that lawyer advertising might elicit. *See* Case Comment, 99 *Harv.L.Rev.* 193, 201 & n. 56 (1985) (reviewing *Zauderer* ). *See generally* J. Auerbach, *Unequal Justice* (1976). Because of these partisan overtones, the court should be very cautious in imposing restrictions on lawyer advertising.[5]

---

[5]*See* "Unanswered Questions", *supra,* at 118–19:

[The Supreme] Court has failed to consider a point raised by lawyers, judges, and other commentators: the possibility that promotional restrictions have much less to do with protecting consumers than with hobbling those professionals to whom promotion is particularly useful.... The Court noted in *Bates* that "cynicism with regard to the [legal] profession may be created by the fact that it long has publicly eschewed advertising,

Third, as the majority opinion concedes, advertising which is largely informational (without matters not "rationally related to attorney selection") is also usually largely ignored. *See ante* at 524–525. To the extent that "rational information" must predominate over or submerge content or expression that appeals to the senses, an empirical confirmation that "informational" advertising may not be truly effective comes from the *Zauderer* case:

> Undignified publicity is sometimes the only way to inform citizens of their legal rights. Whereas Zauderer's arguably tasteless Dalton Shield advertisements attracted over 200 inquiries and led to 106 lawsuits, some of which may have been meritorious claims, the unillustrated, presumably more dignified version of his advertisement attracted no clients. [Case Comment, *supra,* 99 *Harv.L.Rev.* at 198–199.]

The majority concedes, *ante* at 524–525, that it is the irrational or emotional element of a lawyer's advertisement that attracts customers. We should recognize that to the extent that we limit the use of "non-informational" or "irrational" expressions,[6] we are preventing clients (and, arguably, a certain class of clients) from learning about their rights and acting upon them.

Fourth, as the majority recognizes, *ante* at 526–527, the combination of the absence of a comprehensive state certification program for lawyers, the current Rules of Professional Conduct, and the nature of legal practice effectively prevent

---

while condoning the actions of an attorney who structures his social or civic associations so as to provide contacts with potential clients." ....

[S]tated concerns about deception may mask predatory reasons for traditional restrictions on promotion. If it is in some professionals' interest to advertise or solicit, it may be in their competitors' interest to prevent advertising and solicitation. Given that small-firm and less-established lawyers find advertising, solicitation and referral fees more useful than others do, there can be no question that the bar's traditional restrictions on promotion have hurt these two groups of attorneys. [ (Footnotes omitted) (quoting *Bates,* 433 *U.S.* at 370–71, 97 *S.Ct.* at 2702).]

[6]And to the extent that even lawyer advertisement that could technically fit the majority's standards is chilled by the ambiguity and subjectivity of those standards, *see ante* at 517–518.

lawyer advertising from presenting a truly rational or fully informational basis on which consumers can select legal representation. Lawyers are not able to, or not allowed to, present their skills and qualifications to the public in such a way that consumers could make their selections "on the merits." [7] Thus, the minimizing of "non-informational" or "irrational" elements in lawyer advertising will do little or nothing to allow consumers to make an informed and rational choice.

## B.

We must also be apprehensive about the difficult, seemingly endless, and potentially arbitrary regulatory exercises that will be occasioned by the attempted enforcement of the predominantly informational requirement.

The Supreme Court in *Bates* explained that attorneys obtain the right to advertise their services because the public gains advantages by access to such commercial information.

> The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising though entirely commercial, may often carry information of import to significant issues of the day. * * * [C]ommercial speech * * * thus performs an indispensable role in the allocation of resources in a free enterprise system. [433 *U.S.* at 364, 97 *S.Ct.* at 2699, 53 *L.Ed.*2d at 823]

Our own Court has similarly recognized the importance of the "public's right to be informed * * * of the availability, nature, and prices of legal services." *In re Felmeister*, 95 *N.J.* 431, 436 (1984).

The general public has relatively few opportunities to learn of the need for and availability of legal representation. As Justice Larsen aptly observed in a similar context, "many of the [other] traditional points of contact between lawyers and potential clients * * * are simply not viable sources of preliminary legal

---

[7]Were a lawyer to try to do so, he would be exposed to charges of puffing, overreaching, and exaggeration, if not worse. *See, e.g.,* RPC 7.1.

information for a great segment of our population." *Committee on Professional Ethics v. Humphrey*, 355 *N.W.*2d 565, 576 (Iowa 1984) (Larsen, J., dissenting), *vacated*, 472 *U.S.* 1004, 105 *S.Ct.* 2693, 86 *L.Ed.*2d 710 (1985), *on remand*, 377 *N.W.*2d 643 (Iowa 1985), *appeal dismissed*, —— *U.S.* ——, 106 *S.Ct.* 1626, 90 *L.Ed.*2d 174 (1986). The *Bates* decision itself described the extent of insulation of the general public from attorneys, finding that many persons economically situated in "the middle 70% of our population * * * [are] not being reached or served adequately by the legal profession." 433 *U.S.* at 376, 97 *S.Ct.* at 2705, 53 *L.Ed.*2d at 831, quoting ABA, *Revised Handbook on Prepaid Legal Services* 2 (1972).

Public access to legal services can be discouraged by unnecessary restrictions on attorney advertising. Recent research demonstrates that the more free and unencumbered is such attorney advertising the more it "tends to lower prices, stimulate competition, and * * * enable millions of Americans to find an affordable attorney who can help them resolve or represent legal problems." *See* Federal Trade Commission Staff, *Improving Consumer Access to Legal Services: The Case For Removing Restrictions on Truthful Advertising* ix (November 1984); *see also Ohralik, supra*, 436 *U.S.* at 474–76, 98 *S.Ct.* at 1928–29, 56 *L.Ed.*2d at 465–66 (Marshall, J., concurring) (discussing how prohibitions on advertising discriminate against less privileged suppliers, and consumers, of legal services). Thus, the very group of middle-class people who were intended beneficiaries of *Virginia Pharmacy, Bates, R.M.J.*, and *Zauderer* might become unintended victims of a regulatory standard that smothers the effective dissemination of commercial information. The predominantly informational standard could easily stifle the salutary communication to the consuming public about the availability of legal services. Recently, the Connecticut Supreme Court considered certain attorney advertise-

ments to determine whether their message and manner of presentation disserved the public.[8] The Connecticut court held

---

[8]It described the advertisements in some detail.

"The four commercials which were viewed by the court at the hearing may be designated for case of reference as the 'Divorce Case', 'Mumbo Jumbo', 'Accident Case' and 'Bankruptcy Case' advertisement, respectively....

"The 'Divorce Case' scene showed a couple discussing a division of their property. After they agreed to split everything 'right down the middle', the husband uses a power saw to cut through a table and a sofa while their dog looks on soulfully, possibly with some concern that he may suffer the same fate. The announcer then states:

'When a marriage gets in trouble, everyone wants to be fair. But that's not always so easy. The law offices of Trantolo and Trantolo can help you through those difficult times. Because we understand that people facing a divorce don't need any more problems than they already have. The law offices of Trantolo and Trantolo.' ....

"The 'Mumbo Jumbo' ad shows a judge and a lawyer in a courtroom saying only the words 'Mumbo' and 'Jumbo' to each other. The announcer then says:

'When you're faced with bankruptcy, divorce or possible criminal charges, you don't have to be confused by the law. You can be helped by it. Because our courts are designed to serve ordinary people. So are the law offices of Trantolo and Trantolo.' ....

"The 'Accident Case' ad shows a victim of an auto accident pinned under an overturned car. He is approached by another man whereupon the following dialogue takes place:

'Man # 1: Hi there, big guy! I represent the cement truck. You just sign this release and it will settle everything.

'MAN UNDER CAR: Release?

'MAN # 1: I can wait until you have a free arm.

'MAN UNDER CAR: Arm?

'MAN # 1: Which one do you write with?

'ANNOUNCER: If you're involved in an accident, don't ever sign away your legal rights. Protect them. Call the law offices of Trantolo and Trantolo.

'MAN # 1: Can you hold the pen in your teeth?" ....

"The 'Bankruptcy Case' shows a man sitting in his living room in front of a television set with a bowl of popcorn. Two men come and proceed to strip the room of all its furnishings including the television set and finally the bowl of popcorn. The announcer then states:

'ANNOUNCER: When financial tragedy strikes you, you don't have to lose everything, there are laws to protect you. Bankruptcy laws. The law offices of Trantolo and Trantolo can help you protect yourself, because the law is designed to serve ordinary people. So are the law offices of Trantolo and Trantolo.' " [*Grievance Comm. v. Trantolo*, 192 *Conn.* 15, 470 *A.*2d 228, 229 n. 1 (1984)]

that these advertisements served to "inform the listener of the value of professional legal assistance in certain situations and make known that [lawyers, there] the defendants[,] are willing and able to provide such services. * * * [These advertisements] are informative and in no way misleading or deceptive." *Grievance Comm. v. Trantolo,* 192 *Conn.* 15, 470 *A.*2d 228, 234 (1984).

The Connecticut court in *Trantolo* believed that these advertisements were "informative" but did not consider whether they were "predominantly informational." Rather, it focused expressly on whether they were untruthful, deceptive, or confusing. One could be skeptical that such "informative" advertising would satisfy this Court's seemingly more exacting and burdensome standard of "predominantly informational." The advertisements at issue in the Connecticut case thus illustrate the enormous difficulties that lawyers, disciplinary boards, and judges would encounter in applying the predominantly informational standard to regulate such commercial speech.

It seems to me that the evaluation of an advertisement will depend on one's tolerance for or distaste of a subject matter that has an "emotional" appeal. Consequently, personal predilections will inevitably intrude in any characterization of advertising. It is probable that the administration of this requirement will generate unending controversy and chronic inconsistency.

I am doubtful that there is anything approaching a consensus that an informational standard, as proposed in the Court's new rule, serves the cause of attorneys or is required by the public interest. The important point that emerges, in my view, is that unless the advertisement is false, misleading, or confusing, its informational content should not be considered relevant as a

---

It is difficult to disagree with the court's conclusion that these advertisements could catch the public's attention and alert them to the availability and possible need for securing legal services.

regulatory standard any more than its dignity, tastefulness or style. A court should not have to fret about whether an advertisement appeals more to the heart than the mind. Instead, it should concentrate on whether an attorney's advertisement may effectively serve the public by alerting some consumers to a previously unsuspected need for legal help and by fixing in their memory a way to learn about and obtain legal services. Moreover, one may legitimately doubt the necessity as well as the efficacy of a predominantly informational test for advertising. It is unlikely that attorneys will be able to engage with impunity in either blatantly irrational, uninformative, obnoxious or offensive advertising, even if our regulations did not affirmatively include an informational requirement. As observed in *Trantolo, supra*, 470 A.2d at 234, "[i]f some members of the audience find * * * [the advertisements] distasteful, such consumers might very well react by shunning the service offered, thereby implying an informed sanction more effective than any formal regulation."

There are telling concerns that strongly militate against the adoption and attempted enforcement of a standard that lawyers advertise their legal services in a "predominantly informational" manner. That standard, I believe, is too amorphous and controversial and, further, is not moored to any significant state interest. I am satisfied that even were there considerable doubt that the first amendment forbids such a regulatory restriction on commercial speech, the standard now proposed by the Court should be discarded because it is ill-advised as a matter of public policy.

### III.

For the reasons expressed, I would dispense with any affirmative regulatory requirement concerning the content of attorney advertisement of legal services, and, instead, would insist only that such advertising not be misleading, confusing or false. Therefore, on this point, I dissent.

Justice GARIBALDI joins in this opinion.

*For modification* —Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK and O'HERN—4.

*Concurring in part; dissenting in part* —Justices HANDLER and GARIBALDI—2.